Elizabeth L. COHEN, Appellant,

v.

**SECRETARY OF DEPARTMENT OF HEALTH AND HUMAN SERVICES, Appellee.**

**No. 91–2011.**

United States Court of Appeals, Sixth Circuit.

Argued April 3, 1992.

Decided May 7, 1992.

As Amended on Denial of Rehearing June 12, 1992.

Second Rehearing Denied June 30, 1992.

Gerald Benjamin (argued), Levine, Benjamin, Tushman, Bratt, Jerris and Stein, (briefed), Southfield, Mich., for plaintiff-appellant.

Edward L. Koven (argued), Dept. of H & HS, Chicago, Ill., for defendant-appellee.

Before: KEITH and NELSON, Circuit Judges; and TIMBERS,* Senior Circuit Judge.

TIMBERS, Circuit Judge.

Appellant Elizabeth L. Cohen commenced this action in the district court pursuant to § 205(g) of the Social Security Act (the Act), as amended, 42 U.S.C. § 405(g) (1988), for review of a final decision of the Secretary of Health and Human Services (Secretary) which denied her application for disability insurance benefits. The Secretary's decision is the September 18, 1989 decision of an administrative law judge (ALJ) which became final when it was affirmed by the Appeals Council on July 31, 1990. The district court, Robert E. DeMascio, *District Judge*, referred the case to Magistrate Marcia Cooke, who, in her May 31, 1991 Report and Recommendation (a copy of which is attached to our opinion as Appen-

---

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

dix, pages 532–35), concluded that the Secretary's denial of benefits was not supported by substantial evidence and recommended that summary judgment be granted in appellant's favor. The Magistrate Judge was convinced that Cohen was "clearly disabled" by the Epstein–Barr virus and accompanying chronic fatigue syndrome. Following timely objection by the Secretary, the district court reviewed the case and rejected the Magistrate's Report and Recommendation. On July 25, 1991, the district court held that the Secretary's denial of benefits was supported by substantial evidence and affirmed the Secretary's decision.

For the reasons that follow, we reverse the judgment of the district court and remand for an award of benefits.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

### (A)

Appellant Cohen was born on July 24, 1938. She was 51 years old at the time of the ALJ's decision. She holds a doctorate degree in Educational Sociology which she received from Wayne State University in 1977. From 1978 to October 4, 1984, Cohen worked as Assistant to the Dean at Wayne State School of Medicine at a salary of $45,000 a year. She also served as Adjunct Assistant Professor of Medical Sociology at the Wayne State School of Medicine during that period.

Cohen claims benefits for the period October 4, 1984 through June 29, 1988. She has not engaged in substantial gainful activity since October 4, 1984, when she left her positions at Wayne State University. She alleges that she stopped working at that time because she was experiencing symptoms associated with Chronic Epstein–Barr virus, including chronic fatigue syndrome, memory impairment, swollen glands, and balance disorders. The earliest medical report on Cohen's condition is an August 27, 1987 report by Dr. Paul Cheney. When Dr. Cheney examined Cohen her symptoms included chronic fatigue syndrome, urinary tract infections, vision impairment in one eye, weight loss, cognitive function problems, mouth ulcers and sleep disturbances. Cohen also had elevated EBV (Epstein–Barr virus) antibody titers. Dr. Cheney thought she might be suffering from a genetic immunodeficiency unmasked either spontaneously or by some sort of viral infection. He was of the opinion that "I believe [Cohen] meets the published criteria for chronic fatigue syndrome and she may also be evolving multiple sclerosis as a complication of this syndrome.... I doubt very seriously that Elizabeth Cohen will be able to maintain employment in the national economy given the length and severity of her illness."

Dr. Neil Johnson, an internist, examined Cohen on September 14, 1988. He diagnosed Chronic Epstein–Barr virus infection, but stated that "[t]here is no localizing motor weakness. Gross neurological functions are intact. I would be unable to detect minor neuropsychiatric deficiencies in this patient. She is very intelligent and even a decrease in function leaves her well above average." Dr. Johnson, however, recommended a neuropsychological evaluation, which "would likely document various mental neurological deficiencies." He further reported that marked fatigue and the development of mental deficiencies were major problems and that it "appears that this illness is most disabling to this individual."

On June 30, 1989, Cohen was examined by Dr. Hess, an expert on chronic fatigue syndrome and immune dysfunction. He reported that Cohen had another exacerbation of her syndrome on March 23, 1989, during which she experienced fever, headache, rapid heart rate, further impairment of mental function, and weight loss. He further reported that Cohen's deterioration in cognitive function was most noticeable as visual dyslexia (misinterpreting printed words) and difficulty with non-verbal reasoning. He concluded that Cohen's "high level of native intelligence makes it possible for her to compensate for some of these

functional losses, but the deterioration has reached a point where the losses are becoming more obvious, even to her.... Ms. Cohen continues to experience extreme fatigue exacerbated by minor levels of exertion.... Even simple tasks such as grocery shopping can overtax her energy level and cause her to become faint and nearly collapse on the spot. She needs 2–3 hours of sleep to recover from fatigue induced by short trips away from her home. She requires 10–12 hours of sleep at night plus 4–6 hours of sleep during the day.... There is no doubt that Ms. Cohen's health and functional capacity has deteriorated further in recent months. The probability that she will experience significant remission of any of her symptoms is quite small even though periodic fluctuations in severity can be expected."

In July 1989, Cohen also was examined by Dr. Tarras Onischenko, a licensed practicing psychologist, who performed a battery of neuropsychological tests, including a WAIS–R IQ test and the Halstead–Reitan Neuropsychological test battery, to evaluate Cohen's "high order" brain function. Dr. Onischenko found that, although Cohen's performance on the WAIS–R IQ test—test result of 112, with performance and verbal scores of 104 and 109, respectively—still placed her in the "high average" range of intellectual ability, the difference between her Verbal IQ and Performance IQ scores "suggested that [Cohen's] right cerebral hemisphere is more compromised than the contralateral cortical region. In terms of functional considerations, the identified areas of deficit performance suggest that [Cohen] will experience problems managing daily activities which are dependent to a large extent on the identified cognitive skill areas." Dr. Onischenko concluded that the test results "suggested that the client is currently manifesting certain dysfunctions of her highest-order brain-behavior relationships that will debilitate her daily functional status ... [and] suggest[ed] that Ms. Cohen will experience major obstacles in accomplishing many of her goals at a level of performance that was characteristic of her pre-morbid functional status."

Cohen also was examined by Lois P. Brooks, Ed.D., a psychologist and vocational expert. Dr. Brooks concluded that Cohen could still perform unskilled industrial sedentary jobs such as assembling, packaging, and sorting, and that there were approximately 12,000 of these jobs in the metropolitan Detroit area.

Cohen has attempted to remain active despite her illness. In 1986, she founded a national support group for those suffering from the Chronic Epstein–Barr virus. Her involvement with the group consisted primarily of talking on the telephone for approximately two to three hours per week with others suffering from Chronic Epstein–Barr Syndrome. In 1988 Cohen withdrew from the group when her condition worsened.

According to her own testimony, from 1984 to 1987 Cohen, who was a professional ballroom dancer, danced twice a week for three to four hours at a time. From 1987 to March 1989, Cohen continued dancing, though at a reduced schedule of approximately twice a month for an hour at a time. She testified that her condition worsened to the point where "it took a whole day of resting to be able to go out for an hour of dancing. And very soon I realized that an hour of dancing meant two days flat on my back in bed, so I stopped doing that."

In 1986, Cohen enrolled part-time at the University of Detroit Law School. Thereafter she attended that school for six hours per semester. Cohen attended classes three days a week between 12:30 and 4:30 in the afternoon, and did homework for approximately two hours a day. At the time of her hearing before the ALJ on July 31, 1989, Cohen had completed successfully slightly over one full year of law school classes. Despite exacerbation of her symptoms in March 1989, she passed her law school final exams in May 1989.

(B)

The ALJ concluded that, although Cohen has severe Chronic Epstein–Barr virus, she does not have an impairment or a combina-

tion of impairments (or medically equivalent thereto) that qualify for disability under the Act. The ALJ concluded, moreover, that Cohen has the residual functional capacity to perform her past relevant work as an Assistant to the Dean and Adjunct Assistant Professor at the Medical School, or, in the alternative, that she had the capacity to perform jobs that exist in significant numbers in the national economy. The ALJ's conclusions were based primarily on the evidence of Cohen's level of activities for the period in question, which the ALJ found substantially undermined her credibility. The ALJ also found that Cohen's credibility was undermined by her testimony that she passed her most recent law school exam by guessing and repeating key phrases that had been emphasized in class. The ALJ therefore denied Cohen's claim for disability benefits.

The ALJ's decision was upheld by the Appeals Council, and thereby became the final decision of the Secretary. Cohen appealed to the district court. The matter was referred to the Magistrate who, upon finding that Cohen was clearly disabled by the Epstein–Barr virus and associated chronic fatigue syndrome, recommended that the decision of the Secretary denying Cohen benefits be reversed and that Cohen's motion for summary judgment be granted.

The district court, however, rejected the Magistrate's recommendation and affirmed the Secretary's decision that Cohen was not disabled. This appeal followed.

On appeal, Cohen contends that the ALJ (1) failed adequately to consider the conclusions and opinions of the reporting physicians; and (2) placed too much emphasis upon the sporadic activities of Cohen, while failing to consider the long-term aspect of her symptoms. In short, Cohen contends that the ALJ's decision was not supported by substantial evidence.

## II.

We are mindful that, pursuant to 42 U.S.C. § 405(g), we are confined to determining whether the district court erred in concluding that there is substantial evi-

dence to support the Secretary's decision. *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 851 (6th Cir.1986); *Murphy v. Secretary of Health & Human Servs.*, 801 F.2d 182, 184 (6th Cir.1986); *see also Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir.1984) (In a social security case, a circuit court "may not try the case *de novo,* nor resolve conflicts in evidence, nor decide questions of credibility."). "Substantial evidence is more than a scintilla of evidence but less than a preponderance...." *Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989).

## III.

To qualify for disability insurance payments, a claimant must establish that she is disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(a)(1)(D) (1988). A claimant is entitled to receive disability insurance benefits "only if [the claimant's] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (1988); *King v. Heckler,* 742 F.2d 968, 972–73 (6th Cir.1984). In determining whether a claimant is entitled to disability insurance payments, medical opinions and diagnoses of treating physicians are entitled to great weight, and if uncontradicted, are entitled to complete deference. *King, supra,* 742 F.2d at 973. The ALJ, however, is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation. *Id.; Duncan, supra,* 801 F.2d at 855.

In the instant case, the medical opinions and diagnoses of the physicians examining Cohen clearly support the ALJ's conclusion that Cohen is and has been suffering from "severe Chronic Epstein–Barr virus" and associated chronic fatigue. (The chronic fatigue from which Cohen has been suffering is commonly referred to as "chronic fatigue syndrome," as well as

"chronic fatigue and immune dysfunction syndrome." Due to the close association and suspected causal relationship between the chronic Epstein–Barr virus and chronic fatigue syndrome, the two are sometimes referred to synonymously. Although recent studies suggest that the causal relationship between the Epstein–Barr virus and chronic fatigue syndrome may in fact be more attenuated than initially believed, *see, e.g.,* Journal of the Am. Medical Ass'n, *Chronic Fatigue: A Prospective Clinical and Virological Study,* (July 4, 1990), "Chronic Epstein–Barr virus" and "chronic fatigue syndrome" continue to be used somewhat interchangeably.) The medical evidence, however, does not dictate a finding that Cohen is incapable of resuming her previous work at Wayne State University or some other work available in the national economy. Dr. Cheney expressed doubt that Cohen "will be able to maintain" employment in the national economy, but did not conclude that Cohen could not have continued working from October 4, 1984 to the time he examined her in 1987. Dr. Johnson stated that, as of September 14, 1988, Cohen was "very intelligent" and that even with a decrease in mental function, she would remain "well above average." And, although Dr. Hess and Dr. Onischenko clearly believed that Cohen was exhibiting symptoms that would seriously curtail her daily functional status, their diagnoses did not preclude the possibility that Cohen would be able to work. Moreover, Dr. Brooks believed that Cohen possessed the skills required to perform jobs that existed in large numbers in the local economy.

If, however, the medical reports are considered in tandem with Cohen's own testimony regarding her symptoms—particularly the chronic fatigue that often requires her to sleep 14 to 18 hours a day, and to take naps of several hours in order to recover from even minor exertions such as grocery shopping—it appears that Cohen in fact was unable to resume her previous position at Wayne State University or to engage in any substantial employment in the national economy. Although her mental capacity perhaps would have been more

room dancing, Cohen's own testimony provides substantial basis for a finding that Cohen danced twice a week for three to four hours at a time from 1984 to 1987, and that she continued at a reduced schedule of approximately twice a month for an hour at a time from 1987 to March 1989, when she stopped dancing altogether. Cohen also testified, however, that she had to rest all day in order to prepare for her dancing activities, and that she was "wiped out" for a couple of days after she danced.

In the fall of 1986, Cohen enrolled part-time at the University of Detroit Law School. Thereafter she attended that school for approximately six credit hours per semester. Cohen testified that she attended classes between the hours of 12:30 p.m. and 4:00 p.m. three days a week, and that she did homework for approximately two hours a day. Although Cohen continued dancing, on a limited basis, after she enrolled at the law school, Cohen's dancing was confined to an occasional Saturday evening, which allowed her to rest beforehand and recover afterwards.

The ALJ also considered the fact that Cohen, in 1986, founded a national support group for persons suffering from the Epstein–Barr virus. Cohen's participation in the support group consisted primarily of talking over the telephone for approximately two to three hours per week with others suffering from the disease. Cohen withdrew from the support group in the summer of 1988.

We believe that the level of activity maintained by Cohen since she began suffering from the Chronic Epstein–Bar virus and the associated chronic fatigue syndrome is a tribute to her courage and determination in refusing to surrender to the debilitating effects of her illness. Her activities do not, however, warrant a finding that Cohen maintained the residual functional capacity to perform her previous work at Wayne State University or to maintain substantial gainful employment in the national economy. *Cf. Wilcox v. Sullivan,* 917 F.2d 272, 277 (6th Cir.1990) ("[C]laimant should not be penalized because he had the courage and determina-

tion to continue working despite his disabling condition."). The issue here is whether, despite her illness, Cohen had the residual functional capacity to maintain substantial gainful employment during the period for which she now seeks disability benefits. Residual functional capacity is defined as the "maximum degree to which the individual retains the capacity for *sustained* performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c) (1989) (emphasis added). In determining a claimant's physical abilities, we must "assess the severity of [claimant's] impairment(s) and determine [claimant's] residual functional capacity for work activity on a *regular and continuing basis.*" 20 C.F.R. § 404.1545(b) (1989) (emphasis added).

In *Parish v. Califano,* 642 F.2d 188 (6th Cir.1981), we recognized that "[a]ttending college on a part-time basis is not the equivalent of being able to engage in substantial gainful activity. Seven or eight classroom hours are a lot less demanding than full-time remunerative work." *Id.* at 191. This is so, in part, because "one may miss occasional classes without penalty, and homework may be scheduled for those times when the student feels his or her best." *Id.* at 192; *see also Davis v. Califano,* Unempl.Ins.Rep. (CCH) para. 16,779 (S.D.N.Y.1979) ("[E]vidence of the limited ability to perform some physical acts on an occasional basis is inadequate to support a reasonable conclusion of ability to engage in substantial gainful activity.").

The logic of *Parish* is particularly apposite here, in view of the nature of Cohen's illness. Chronic fatigue syndrome is characterized by periods of· exacerbation and remission. *Cf. Wilcox, supra,* 917 F.2d at 274–77 (discussing episodic nature of multiple sclerosis). During periods of exacerbation, Cohen is confined to her bed for sixteen to eighteen hours a day, and even simple tasks such as grocery shopping can bring her near the point of collapse. Clearly, the fact that Cohen—still an intelligent woman despite the degree of cognitive dysfunction caused by her illness—has had the capacity to pass one to two law school classes per semester since the fall of 1986

does not indicate that she was capable of sustaining substantial gainful employment in the national economy. Similarly, the fact that she, a professional ballroom dancer prior to the onset of her illness, was able to continue dancing to a limited extent during the period for which she now claims disability does not warrant the conclusion that she could have engaged in substantial gainful employment. Cohen required significant rest both before and after her dance activities, and, despite her resting, over the course of the period for which she now claims disability Cohen's dance schedule was significantly decreased and ultimately terminated altogether. Cohen's efforts to continue dancing merely suggest that she was struggling to maintain some semblance of normalcy in a life otherwise turned on end by the onset of chronic fatigue syndrome.

Her activity with respect to the support group for herself and others suffering from the Chronic Epstein–Barr virus/chronic fatigue syndrome, which consisted primarily of talking on the telephone for two to three hours per week, likewise hardly suggests that she was capable of engaging in substantial gainful employment. Rather, Cohen's founding of the support group underscores the genuineness of her testimony regarding her illness.

The final basis for the ALJ's conclusion that Cohen maintained the residual capacity to continue in her previous position at Wayne State University or to engage in other employment in the national economy was Cohen's testimony regarding a recent law school exam that she had passed. The ALJ questioned Cohen as to how, given the cognitive dysfunction she allegedly was experiencing, she had been able to pass her most recent law school exam. Cohen responded that she had passed her most recent exam by picking key words and repeating phrases that had been emphasized during class. The ALJ found that Cohen's answer undermined her credibility as a witness.

While we recognize that the ALJ's credibility determinations are entitled to deference, *Garner, supra,* 745 F.2d at 387;

*Houston v. Secretary of Health & Human Servs.,* 736 F.2d 365, 367 (6th Cir.1984), we are convinced that the ALJ's emphasis on Cohen's ability to pass her law school examination was misplaced. The medical evidence, as well as her own testimony, show that Cohen maintained an above average level of intelligence despite the cognitive dysfunction that she had been experiencing. The issue, however, is not whether Cohen maintained the intelligence to continue substantial gainful employment; rather, the issue is whether Cohen has been rendered disabled by the chronic fatigue syndrome and other symptoms associated with her illness. Her ability successfully to attend law school on a part-time basis (Cohen completed one year of law school over the course of three calendar years), while probative of whether she was capable of engaging in substantial gainful activity, in view of the nature of Cohen's illness, does not provide substantial basis for the ALJ's conclusion that Cohen had the residual capacity to engage in substantial gainful employment.

We acknowledge that this is a close case, as borne out by the swinging back and forth between the ALJ, the Secretary, the Magistrate, the district court and now our Court. In a close case, it is well to bear in mind that "[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion." *Marcus v. Califano,* 615 F.2d 23, 29 (2d Cir.1979), and cases cited. We hold that the district court erred in rejecting the Magistrate's recommendation and determining that the ALJ's decision to deny Cohen disability insurance benefits for the period from October 4, 1984 to June 29, 1988 was supported by substantial evidence.

IV.

To summarize:

We hold that the district court erred in rejecting the Magistrate's recommendation that the Secretary's denial of benefits was not supported by substantial evidence, and in determining that there was substantial evidence to support the ALJ's conclusion

that Cohen maintained the residual capacity to continue in her position at Wayne State University or to engage in other substantial gainful employment in the national economy over the period for which she claimed disability benefits.

The judgment of the district court is reversed and the case is remanded to the district court with instructions to remand to the Secretary for an award of benefits.

*Reversed and remanded.*

## APPENDIX

United States District Court Eastern District of Michigan Southern Division

ELIZABETH L. COHEN, Plaintiff(s)

vs.

LOUIS W. SULLIVAN, M.D., SECRETARY OF DEPARTMENT OF HEALTH AND HUMAN SERVICES Defendant(s)

NO. 91–70279–DT

HONORABLE ROBERT E. DeMASCIO

MAGISTRATE JUDGE MARCIA G. COOKE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is an action timely filed under 205(g), as amended, 42 U.S.C. 405(g), to review a final decision of the Secretary of Health and Human Services denying plaintiff's application for disability insurance benefits. The initial application was denied. Plaintiff exhausted available administrative remedies including a hearing before an Administrative Law Judge (ALJ), and thereafter filed suit in this court. The issue before this court is whether there is substantial evidence in the record to support the Secretary's determination. *Gibson v. Secretary of Health, Education and Welfare*, 678 F.2d 653, 654 (6th Cir. 1982).

Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 [91 S.Ct. 1420, 1427, 28 L.Ed.2d 842] (1971). The claimant has the burden of showing by a preponderance of the evidence, inability to perform his/her former work. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980). Once that claimant has established this prima facie case, the burden should shift to the Secretary to show by expert vocational testimony or otherwise that there exists other substantial gainful employment in the national economy which the claimant is capable of performing. *Young v. Califano*, 633 F.2d 569, 570 (6th Cir.1980). Upon appellate review, the court may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility, *Meyers [Myers] v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972). Even if this court might arrive at a different factual conclusion, the decision must be affirmed if it is supported by substantial evidence. *Lane v. Gardner*, 374 F.2d 616 (6th Cir.1967).

## I.

Plaintiff filed her application for Social Security disability benefits on June 29, 1988. (TR. 79). She alleged she has been unable to work since October 4, 1984 due to the onset of chronic Epstein Barr virus and chronic fatigue syndrome (TR. 79).

Prior to her alleged disability, she worked as an assistant to the dean of the medical school of a university (TR. 37). She is also attending law school on a sporadic basis. She testified at the administrative hearing that she had to leave her last job, despite her education and previous work history because she felt so poorly she felt she could no longer continue to work. She maintained that the chronic pain associated with chronic fatigue syndrome, the loss of her mental faculties and the recurrent infections including headaches, respiratory infections and vaginal infections prevent her from working.

A vocational expert, Lois Brooks also testified at the hearing (TR. 70). Dr. Brooks concluded that the plaintiff's past relevant work was that of highly skilled work. Dr. Brooks testified the plaintiff has a PH.D from Wayne State University

and that she has had a number of jobs over a period of time including assistant to the dean for research, adjunct assistant professor, lecturer and medical sociology. Her work would primarily be that of a sedentary nature. The vocational expert further found that the symptoms as delineated by the Administrative Law Judge (ALJ), beginning in the hypothetical to the point where she can perform work related activities with a maximum of twenty pounds from an exertion stand point would allow her to transfer skills in the other areas. (TR. 73–74). She found that the plaintiff has acquired skills such as a high degree of technical knowledge of teaching, of dealing with data, analyzing, coordinating, systemizing, interpreting data; a high degree of communication skills in terms of speaking, writing and reading. She further noted that these skills are not at the level the plaintiff once possessed, but certainly to a much lessor level utilized in a wide range of clerical kinds of jobs which are basically semi-skilled in nature. (TR. 74).

She also noted that given the plaintiff's problem with reading and writing that it would affect all skilled and semi-skilled work and would basically limit her to unskilled areas i.e. assembly, packaging and sorting (TR. 75).

The ALJ found that the medical evidence establishes plaintiff has severe chronic Epstein Barr Virus, but she does not have an impairment or a combination of impairments listed in, or medically equal to one listed in Appendix I, Subpart P, Regulation No. 4 (TR. 21). He further found that the plaintiff has the residual functional capacity to perform work related activities except for work involving lifting and carrying more than twenty pounds, sitting more than six hours out of an eight hour work day and squatting. He further found that plaintiff's ability to use foot hand controls and her grip strength for fine and gross manipulation are somewhat reduced and she would have to avoid extreme levels of dust and smoke and be allowed to take breaks (TR. 21). He concluded therefore, that the plaintiff's past relevant work as an assistant to the dean for research for the medical school, and adjunct assistant professor for a medical school did not require the performance of work related activities precluded by the above limitations. Therefore, he concluded the plaintiff was not under a disability as defined by the Social Security Act. (TR. 22). There is not substantial evidence in this record to support the finding of the Administrative Law Judge.

## II.

In order to be entitled to disability insurance benefits under the Social Security Act, plaintiff must meet a two fold test. First, there must be a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve (12) months; and second, the impairment must render the plaintiff unable to engage in any substantial employment. 42 U.S.C. 423(d)(1)(A); 1382(a)(3)(A)(B). Substantial gainful activity is defined as work activity which involves doing significant physical and mental activities that are performed for pay or profit. 20 C.F.R. § 404.1572(a)(b) 416.-972(a)(b). Furthermore, Social Security Regulations provide that all symptoms, including pain be corroborated by objective clinical signs and laboratory findings which can be shown to be the cause of the symptoms. 20 C.F.R. § 404.1529. Where plaintiff has the ability to perform past relevant work, or other work that exists in significant numbers, a finding must be made that he/she is not disabled.

The medical evidence in this record clearly supports the fact that this plaintiff suffers from chronic Epstein Barr Virus and its associated symptomatology which is often called chronic fatigue syndrome. The medical evidence indicates as early as her childhood the plaintiff has suffered with the virus and its symptomatology (TR. 142, 155). The plaintiff has always suffered with a multitude of viral illnesses, however, the most serious began in 1966. (TR. 142). Since that time she has suffered with several illnesses. In 1982, a series of flu-like symptoms began to engulf the plaintiff.

She suffered from dysfunctional fatigue, muscle weakness, headaches, constant vaginal yeast infections, bladder and E.coli infections that simply did not respond to antibiotics (TR. 143). Between 1982 to 1987 she gained 49 pounds. In 1984 she began to suffer with severe sinovitis and bursitis of the left joint. (TR. 143). In 1984 she lost 65% of her sight in her one eye due to optic neuritis. In 1986 her disease once again flared and she continued to have urinary tract symptoms, headaches, sore throat and fatigue.

The diagnosis of Epstein Barr syndrome has been confirmed several times. (TR. 155–156, 158, 190, 192). Plaintiff's most recent exacerbation occurred in March, 1989 (TR. 190). This resulted in her being afflicted with fibrous pericarditis. She lost 24 pounds and suffers now from multi-focal brain dysfunction (TR. 190–191).

It is clear to this Magistrate Judge that plaintiff is an intelligent and well educated woman. It is also clear based on the medical records contained in this file that this plaintiff suffers from chronic Epstein Barr syndrome. The plaintiff is articulate and understands the nature and symptomatology of her disease. She was able to explain, quite accurately, the affect the disease has had on her life. The plaintiff was an active, intelligent woman who is now reduced to being almost bedridden because of her disease.[1] As the plaintiff notes in her brief in support of her motion for summary judgment:

> The Administrative Law Judge has latched onto plaintiff's overall I.Q. test score of 112, law school attendance (no matter how sporadic, labored and ineffectual), and her highly irregular ballroom dancing as a smoke screen in attempt to obfuscate the real issue in this case, whether plaintiff's chronic fatigue and dysfunctional cognitive symptoms have

[1]. The ALJ makes much of the fact that the plaintiff attends law school on a part-time basis. However, given her past educational achievements the fact that the plaintiff has only been able to progress less than two semesters in four years is indicative of the fatigue that she suffers.

reached a level causing total disability. Plaintiff's Brief at 16.

The medical evidence supports the fact that the plaintiff has a high I.Q. and superior cognitive abilities and this enabled her to continue working for as long as she did without her fatigue problems causing deficiencies in performance (TR. 205).

The plaintiff never testified that she was totally bedridden. She merely chronicled how chronic fatigue syndrome has affected her life to such a degree that she is no longer able to function. In her case, fatigue represents the kind of pain that often accompanies many other diseases.

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir.1986) the Sixth Circuit Court of Appeals set forth the analysis to be used in applying the standard for the evaluation of pain. First, the Secretary must determine that there is objective medical evidence of an underlying medical condition. If there is such evidence, the Secretary must determine: 1) whether the objective medical evidence confirms the alleged severity of the pain arising from the condition or 2) whether the established medical condition is of such a level of severity that can reasonably be expected to produce the alleged severe pain and other functional limitations. It is unnecessary to meet both requirements of the second prong. The *Duncan* Test continues to be the law of the Sixth Circuit. *McCormick v. Secretary of Health and Human Services*, 861 F.2d 998, 1003 (6th Cir.1988).

The medical evidence clearly supports the fact that the plaintiff suffers with Epstein Barr virus and the accompanying chronic fatigue syndrome. The medical tests accompanying it support her testimony of chronic infections, fatigue and other disease. This plaintiff is clearly disabled. The plaintiff has met both prongs of the *Duncan* test.

The plaintiff's effort to learn a new profession in order to cope with her disease and possibly enter a new career should not be seen as a bar to receiving benefits. Hopefully, the plaintiff will one day recover and be able again to become a member of the working community.

## RECOMMENDATION

IT IS THE REPORT AND RECOMMEN-DATION of this Magistrate Judge that the plaintiff's Motion for Summary Judgment be GRANTED, the defendant's Motion for Summary Judgment be DENIED and the decision of the Secretary of Health and Human Services REVERSED.

The parties are hereby informed that objections may be filed to this Report and Recommendation within ten days after being served with a copy thereof as provided for in 28 U.S.C. § 636(b)(1)(C) and Local Rule C–4 and that failure to file objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir.1981). *See also*, *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 [88 L.Ed.2d 435] (1985).

/s/Marcia G. Cooke
MARCIA G. COOKE
UNITED STATES MAGISTRATE JUDGE

DATED: May 31, 1991

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I agree that the judgment ought to be set aside, but I would instruct the district court to remand the case to the Secretary for further factfinding.

The principal reasons for disability among patients with symptoms like Dr. Cohen's, according to Dr. Cheney, are "cognitive impairment" and "dysfunctional fatigue." The ALJ found that Dr. Cohen's cognitive impairment was not disabling, and there was substantial evidence in the record (Dr. Cohen's ability to pass her law school examinations, *e.g.*) to support this finding. As to the extent of Dr. Cohen's fatigue, however, there was testimony that she typically slept 18 hours a day and had to nap from two to four hours during the day. The vocational expert, Dr. Brooks, testified that the need to take such naps would "pretty much" preclude employment. Dr. Brooks also said that an individual "experiencing extreme fatigue which would be exacerbated by even minor levels of exertion" could not perform any of the jobs about which she had testified. Similarly, Dr. Brooks said, an individual who required two to three hours of sleep in order to recover from fatigue induced by short trips away from home would be unable to work. Finally, Dr. Brooks testified that an individual who had to rest approximately 18 hours a day would be unable to perform any jobs that exist in the national economy.

The Administrative Law Judge found that "[t]he claimant's subjective complaints were not completely credible given her activities," but he made no specific findings on the actual extent of Dr. Cohen's fatigue. "[T]he best way to document the nature and severity of this fatigue syndrome," according to Dr. Cheney, lies in "[o]bjective findings of immune system abnormalities and the elevation of lymphocyte secreted cytokines." I cannot tell, from this record, to what extent Dr. Cohen's immune system abnormalities have been objectively verified. Neither can I tell what her laboratory reports show about "the elevation of lymphocyte secreted cytokines"—and the decision issued by the ALJ suggests that he may have been no better informed on these matters than I am. Under the circumstances, it seems to me, the appropriate course would be to remand the case to the agency for specific findings on the significance of the laboratory reports and on whether Dr. Cohen simply lacked the stamina necessary to engage in substantial gainful employment. For us to make such findings ourselves, in my view, is to undertake a task that is outside our province.