**Judith IRWIN, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**Civ. No. 92–1616–JE.**

United States District Court,
D. Oregon.

Sept. 24, 1993.

James S. Coon, Royce, Swanson, Thomas & Coon, Portland, OR, for plaintiff.

Jack C. Wong, U.S. Atty., Craig J. Casey, Asst. U.S. Atty., Portland, OR, Ben A. Porter, Sp. Asst. U.S. Atty., Seattle, WA, for defendant.

## ORDER

REDDEN, Chief Judge:

Magistrate Judge Jelderks filed his Findings and Recommendation on August 13, 1993. The matter is now before me. *See* 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). No objections have been timely filed. This relieves me of my obligation to give the factual findings *de novo* review. *Lorin Corp. v. Goto & Co., Ltd.*, 700 F.2d 1202, 1206 (8th Cir.1983); *See also Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir.1983). Having reviewed the legal principles *de novo*, I find no error.

Accordingly, I ADOPT Magistrate Judge Jelderks' Findings and Recommendation (doc. # 15) that the decision of the Secretary should be reversed and remanded for a determination of benefits.

IT SO ORDERED.

## FINDINGS AND RECOMMENDATION

August 13, 1993

JELDERKS, Magistrate Judge:

Plaintiff Judith Irwin brings this action for judicial review of the Secretary's final decision denying Title II disability insurance benefits. This court has jurisdiction under 42 U.S.C. § 405(g). For the reasons set forth below, the decision of the Secretary should be reversed and remanded for a determination of benefits.

### PROCEDURAL BACKGROUND

Plaintiff applied for Title II benefits on December 11, 1990. Tr. 88–90. The application was denied initially and upon reconsideration. Tr. 109–110, 133–34. The ALJ held a hearing on March 16, 1992. Tr. 30–86. On July 28, 1992, the ALJ issued an opinion finding plaintiff not disabled. Tr. 17–26. This opinion became the final decision of the Secretary when the Appeals Council declined review. 20 C.F.R. § 404.981 (1992); Tr. 3–4.

### STATEMENT OF THE FACTS

Plaintiff was born February 4, 1954, making her 38 years old at the time of the hearing. Tr. 88. She has a Master's degree in journalism, Tr. 40, and has past relevant work experience as an executive assistant with a state rehabilitation agency, publications intern, university journalism instructor, free-lance journalist, sandwich maker, and short order cook. Tr. 145. Plaintiff has not performed any substantial gainful activity since April 27, 1988, shortly before she took an unpaid leave of absence from her job as Executive Assistant to the Director of the Commission for the Blind because of health problems. Tr. 20. Plaintiff first became ill in October, 1981, while working as a free-lance journalist. Tr. 41, 141, 145. She describes the illness as an upper respiratory infection that led to bronchitis and a persistent cough, coupled with profound exhausting fatigue and insomnia. Tr. 173. She was unable to work for almost a year. Tr. 41, 141, 173. The cause of the illness was never determined, though plaintiff notes her landlord insulated the attic about the time her illness commenced and suspects a connection between the two events. Tr. 173. By the fall of 1982 plaintiff had recovered sufficiently to attend graduate school, while also working part-time as a journalism instructor. Tr. 145, 173. After graduating in 1984, plaintiff spent a summer as a publications intern, before commencing her employment at the Commission for the Blind. *Id.* Her duties at the Commission included public relations, grant writing, staff training and program evaluation. Tr. 40. Plaintiff consistently received outstanding performance evaluations throughout her tenure at the Commission. Tr. 228 33.

Beginning in late 1987, plaintiff suffered repeated episodes of increased fatigue, nausea, a sensation that her whole body was spinning inside, mild disequilibrium made worse by trying to concentrate or read, marked difficulty in putting her thoughts together, coupled with episodes of depres-

sion. Tr. 173. She also complained of nasal drainage, cough and ear discomfort. *Id.* In January, 1988 plaintiff was treated at Kaiser Permanente for her upper respiratory problems. *Id.* She also obtained outpatient treatment at Kaiser for depression. *Id.* In March, 1988 plaintiff returned to Kaiser for further evaluation of her condition. *Id.* She described the fatigue as so severe that she had to limit her social engagements and aerobic exercises and concentrate all her minimal available energy on her work. *Id.* Even so, she felt she could barely keep up with her work despite tremendous effort, and had already missed 5–6 weeks of work as a result of her illness. *Id.* A physical examination and battery of blood and urine tests were essentially normal. Tr. 174–75, 213, 218. Dr. Joseph Kane, an infectious disease specialist, concluded that:

> The patient's symptoms over the past six months and her illness of 1–2 years duration six years ago are compatible with the newly recognized syndrome called the chronic fatigue syndrome. The presence of incapacitating fatigue as a dominant symptom in association with difficulties in concentration and mental efforts leading to disequilibrium syndrome is also quite suggestive of this diagnosis. The recurring

upper respiratory symptoms, symptoms of lymphadenopathy without objective findings and history of seasonal allergies and mental depression in association with her fatigue are all compatible with this diagnosis. Absent from her symptom complex are recurring low grade fevers, muscle or joint pains which are frequently seen but not necessarily seen.

Tr. 175.[1] In May, 1988, plaintiff took a 3–month leave of absence without pay from her job, citing health problems. Tr. 234. An employment evaluation for the period June 1, 1987 through June 1, 1988 noted that plaintiff was ill and missed a great deal of time during the latter part of the performance period, but had been performing her job in a satisfactory manner until the onset of her illness. Tr. 233.

On June 10, 1988 plaintiff was seen by another Kaiser physician, Dr. Leslie Schmertzler, whose specialty is internal medicine. Tr. 211. Plaintiff advised Dr. Schmertzler that she was starting to feel more energy and thought the rest was helping, but that she continued to experience fatigue and trouble concentrating. *Id.* Plaintiff sought an extension of her unpaid leave of absence, but was told her request

---

1. CFS is typically diagnosed by reference to a set of symptoms first identified in Holmes, Kaplan, Gantz, et al., *Chronic Fatigue Syndrome: A Working Case Definition*, 108 Ann.Intern.Med. 387 (1988) (commonly referred to as the "CDC case definition" because it has been adopted by the Center for Disease Control). Under the CDC case definition, a diagnosis of CFS is appropriate where the patient meets all four of the following criteria:

(A) The patient has fatigue that is severe enough to reduce average daily activity below 50 per cent of the patient's premorbid activity level for a period of at least six months, in a patient with no history of similar symptoms.
(B) Other clinical conditions that may produce similar symptoms have been excluded.
(C) At least two of the following symptoms have been documented by a physician on at least two occasions no less than one month apart:
(1) low-grade fever (37.6 degrees—38.6 degrees C orally);
(2) nonexudative pharyngitis; or
(3) palpable or tender anterior, posterior, or axillary lymph nodes.
(D) At least six of the following symptoms are present, having begun at or after the time of

onset of increased fatigability, and having persisted or recurred over a period of at least six months:
(1) low-grade fever (37.5°—38.6°C orally);
(2) sore throat;
(3) painful lymph nodes in the anterior or posterior cervical or axillary distribution;
(4) unexplained generalized muscle weakness;
(5) muscle discomfort or myalgia;
(6) prolonged (24 hours or greater) generalized fatigue after levels of exercise that would have been easily tolerated in the patient's premorbid state;
(7) generalized headache (excluding any headaches patient had in premorbid state);
(8) migratory arthralgia without joint swelling or redness;
(9) neuropsychiatric complaints (1 or more): photophobia, transient scotomata, forgetfulness, excessive irritability, confusion, difficulty thinking, inability to concentrate, depression;
(10) sleep disturbance (either hyper- or insomnia); and
(11) description of main symptom complex as initially developing over a few hours to days.

could not be accommodated. Tr. 43, 210, 264. On July 22, 1988 plaintiff resigned from her job "because health problems prevent me from working at this time." Tr. 235. Later that day, plaintiff was examined by Dr. Schmertzler. She reported sleeping better, but still spent twelve hours a day in bed. Tr. 210. She reported she was now walking 30–60 minutes a day and feeling much better, but was still not ready to return to work. *Id.*

Plaintiff continued seeing Dr. Schmertzler every few months. In October, 1988 plaintiff reported she was operating at 60% of capacity, compared to 45% in July. Tr. 209. She was still seeing a counselor for depression, but her grief over loss of her job was easing, and she hoped within two or three months she would be well enough to perform part-time work. *Id.* In December, 1988 plaintiff reported her condition had deteriorated during the past month. Tr. 209. Dr. Schmertzler's notes from February, 1989 record that plaintiff continued to experience fatigue exacerbated by minimal activity associated with recurrent flu episodes and difficulty concentrating. Tr. 207. She had abandoned plans to resume part-time work. *Id.* Dr. Schmertzler's notes from his July, 1989 examination record that plaintiff was quite depressed and frustrated at not being able to pursue her profession or to meet her own expectations of herself. Tr. 206.

Plaintiff's quarterly visits with Dr. Schmertzler continued over the next few years. During that time Dr. Schmertzler occasionally prescribed medicines to help plaintiff sleep or relax. Tr. 203. He also sought to coordinate his treatment with that provided by any counselor or psychiatrist who was treating plaintiff during the same period. Tr. 206. Plaintiff's condition varied considerably. . At times she reported feeling much improved, but those improvements were seldom long-lasting. In September, 1990 she reported feeling well enough to go camping without fatigue and was even planning a trip to visit her cousin in Boise. Tr. 200. By the following office visit in January, 1991, however, plaintiff reported sleeping 11

hours a night, plus an additional five hours during the day, and could walk for a maximum of only 15 minutes at a time. Tr. 199. She also reported continued cognitive impairment, and found it difficult to drive or make out a shopping list. *Id.*

In December, 1990, plaintiff applied for Title II benefits, stating she could work on average no more than four hours a day without experiencing severe exhaustion and flu symptoms. Tr. 88–90, 141. This level of activity fluctuated daily between zero and eight hours, making it difficult or impossible to plan activity. Tr. 141. She was able to cook simple meals, wash dishes, and do laundry. Tr. 144. Other cleaning tasks could only be performed on a "good day". *Id.* On a good day she could also attend movies or go for a walk in the park. *Id.* She reported being able to drive short distances (1–5 miles) almost every day, but could drive longer distances only 5–10 days per month. *Id.*

In response to a questionnaire from the Secretary in January, 1991, plaintiff reported difficulty absorbing or retaining factual information. Tr. 167. She stated that grocery shopping was extremely difficult, both because of fatigue and cognitive problems that required her to concentrate her attention on the item she was looking for. *Id.* She was able to visit with friends for two or three hours an average of once a week. Tr. 168. She also attended meetings of a chronic fatigue support group when able, but reported that she missed about half the meetings. *Id.* Plaintiff also stated she had difficulty planning activities because she was never sure until the day of the event whether she could keep the engagement. Tr. 169.

In April, 1991 plaintiff reported she was feeling somewhat better, and on a good day—but only on a good day—could perform routine errands, balance a checkbook, and clean her house. Tr. 151. In July, 1991 plaintiff advised Dr. Schmertzler she felt considerably improved, able to perform 4½ to 5 hours of activity a day.[2] Tr. 189. She had even begun to offer occasional writing lessons in her home, albeit on a very limited

---

**2.** It is unclear from Dr. Schmertzler's notes for this visit whether plaintiff was describing her capacity for continuous activity or a daily total.

However, other documents in the file confirm this was a daily total. Tr. 141, 220.

basis. Tr. 151, 157, 163. She was able to take care of her household chores with little difficulty. Tr. 163. By the fall of 1991, though, she reported having suffered another relapse and being unable to perform household chores and errands. *Id.*

The record contains little information about plaintiff's physical condition after that date, other than plaintiff's testimony at the disability hearing in March, 1992.[3] At the hearing, plaintiff estimated that in an average month about 25 percent of her days were "good days," another 25 percent were "bad days," and the remaining 50 percent were somewhere in between. Tr. 45–46. On a good day she could run errands, clean, or perform other activities for about two hours. Tr. 45. She then lay down for two hours, after which she could perform another two hours of activity. *Id.* On a bad day she could do little more than get dressed, take a shower, and eat three meals. *Id.* She was unable to predict in advance what a day would be like. Tr. 46–47. Plaintiff testified that while lying down she often embroiders, but must stop after an hour because she can no longer concentrate enough to follow the pattern. Tr. 49. She testified that she can usually read simple mysteries or novels, but found the Pulitzer Prize winning novel "The Mama Kings Play Songs of Love" too complicated to read. Tr. 55, 55–60. She goes to movies once or twice a month, and leaves her house on average every two or three days. Tr. 51.

Stephanie Striffler, head of the Oregon Department of Justice special litigation unit, testified on behalf of plaintiff. Tr. 62–73. Ms. Striffler described herself as a close friend of plaintiff for over twenty years. Tr. 63. She believed plaintiff's behavior had changed considerably since the fall of 1987. Tr. 63–73. Until that time, plaintiff frequently joined Ms. Striffler on outings, including movies, dinners, and day or weekend trips to the Columbia Gorge and Oregon Coast. Tr. 65–66. Thereafter, although they were still good friends, outings had become much more infrequent. Tr. 66, 68–69. They

still saw each other, but plaintiff had been unable to go on any weekend trips nor had they even spent a whole day together. Tr. 66. Plans for activities became very tentative. *Id.* Ms. Striffler estimated that if she planned to go out to dinner with plaintiff, the odds were roughly 50–50 that they would actually go. *Id.* Plaintiff was unable to attend either Ms. Striffler's birthday party or her baby shower. *Id.* The witness estimated that on one-quarter to one-third of the occasions when she calls plaintiff at home, plaintiff is unable to carry on an extended conversation and has to ask the witness to call back another day. Tr. 70.

Ms. Striffler also testified that plaintiff always takes a nap in the early afternoon, and the witness was careful not to call at that hour. Tr. 67. When they get together for brunch, plaintiff invariably "has to get home for her nap." *Id.* Ms. Striffler observed that plaintiff appears to have a shorter attention span nowadays. Tr. 69. She also described the difficulty plaintiff had in performing tasks such as critiquing a resume. Tr. 66–67. In response to a question from the ALJ, Ms. Striffler testified that plaintiff rarely asks for help in running errands or attending to other personal needs. Tr. 72. Ms. Striffler recalled one occasion when she had to drive plaintiff to a doctor's appointment, and said she occasionally brought her food, but plaintiff usually insisted on doing things for herself. *Id.* Ms. Striffler thought plaintiff was determined to be independent. *Id.*

The record includes reports and/or conclusions from seven doctors, excluding reports by allergists, gynecologists, and others not relevant to this proceeding. Dr. Kane, the physician at Kaiser who first diagnosed plaintiff as suffering from chronic fatigue syndrome ("CFS"), re-evaluated plaintiff in March, 1992. Tr. 253–56. A physical examination was mostly normal, although Dr. Kane did detect "mildly tender 0.5 to 1 cm bilateral anterior cervical nodes palpable." Tr. 255. He also noted that plaintiff's temperature had been recorded on two recent visits to

---

**3.** Plaintiff's treating physician, Dr. Schmertzler, took an extended leave of absence in early 1992.

Tr. 252.

Kaiser, and on both occasions she had a low-grade fever (99.4 degrees and 99.8 degrees). Tr. 254. Based upon his physical examination, laboratory tests, a review of his own notes and those of the other doctors at Kaiser, and the history provided by plaintiff, Dr. Kane reaffirmed his diagnosis of CFS:

> The patient's constellation of symptoms including debilitating fatigue, flu-like symptoms, sore throat, tender cervical lymph glands, low grade fevers, myalgias and artralgias, difficulty concentrating, disequilibrium symptoms and exercise intolerance which, by her history, have recurred and persisted since her first symptoms in about 1981 .... [i]n the absence of other recognized diseases, is characteristic of the Chronic Fatigue Syndrome.

Tr. 255. Plaintiff's treating physician, Dr. Schmertzler, advised the Secretary in April 1991 that he believed plaintiff "has been disabled" as a result of CFS because she was unable to engage in activities beyond the most sedentary things for more than a total of four to four and one-half hours per day, required intermittent rests in order to engage in that much activity, and could not predict the occasions on which she would be able to engage in sustained activity. Tr. 220. Dr. Schmertzler acknowledged that his report was necessarily based upon plaintiff's subjective assessment of her condition and he lacked "any quantitative measures to evaluate her functional status beyond the history that she reports to me." Id. In a subsequent telephone conversation with a consulting physician designated by the Secretary, Dr. Schmertzler also stated that plaintiff has no known medical conditions other than CFS which would cause her to be fatigued, reiterated that there are no objective clinical findings on which to base a diagnosis, and stated that in his opinion plaintiff seems sincere about obtaining treatment for her health problems. Tr. 219.

Dr. David Rullman examined plaintiff on one occasion in April, 1992 at the request of the Secretary. Tr. 85, 258–60. Dr. Rullman concluded that plaintiff "probably fulfills the usual major and minor criteria" for diagnosing CFS, although he cautioned that his conclusions were necessarily based upon plaintiff's self-report of her condition. Tr. 260. Dr. Rullman also noted that plaintiff's pulse rate was abnormally high, in the range of 120–130, and that further tests might be needed to ascertain the cause of this tachycardia. Id.

Dr. Scott Walker, a psychiatrist at Kaiser, treated plaintiff for anxiety and depression. Dr. Walker's records show that he saw plaintiff on a dozen occasions between June, 1990 and July, 1991. Tr. 178–84. During that time Dr. Walker prescribed various drugs. Tr. 178–87. His records are mostly unremarkable, recording periodic fluctuations in her levels of anxiety, mood, and reports of fatigue. Id. Dr. Walker's notes do indicate that on at least two occasions, once in February 1991 and again in June of that year, plaintiff called to cancel an appointment and reschedule it for a later date.[4] Tr. 178, 181.

In February, 1992 plaintiff was examined by Dr. Sheila Bastien, a California neuropsychologist who specializes in patients with CFS. Tr. 236–50. Dr. Bastien wrote a lengthy report detailing the results of a battery of psychological tests she administered to plaintiff. Id. Dr. Bastien observed plaintiff showed no signs of depression during the interview and testing, and was quite cheerful, appropriate, pleasant and easy to test. Tr. 237. Dr. Bastien felt plaintiff's symptoms of depression were being adequately controlled by the anti-depressant drugs she was taking, and posed no obstacle to her ability to work. Id.

Dr. Bastien expressed great concern about the results of other tests administered to plaintiff. Plaintiff's overall IQ was 113, which was in the High Average range. Tr. 240. Nonetheless, Dr. Bastien noted that plaintiff had previously taken an IQ test during her senior year in high school and achieved an overall score of 129. Tr. 239, 250. Dr. Bastien observed that IQ is endur-

---

4. Elsewhere in the record there is a reference to a letter dated December 12, 1990 from Betsy M. McCartor, L.C.S.W., who was plaintiff's therapist for a number of years. The letter stated that during the past three years, plaintiff had canceled sessions with Ms. McCartor on many occasions because plaintiff was too sick to come to the office. Tr. 238.

ing and does not change much unless something interferes with brain function. Tr. 241. Even more significant was plaintiff's performance on specific components of the IQ test. Her score on the Performance component was only 99, which Dr. Bastien estimated represented approximately a 30 point loss from her performance on the earlier IQ exam. Tr. 240–41, 244–45.

Dr. Bastien was particularly concerned with the great spread between plaintiff's scores on the verbal (122) and performance (99) components of the exam. Tr. 240–41. Dr. Bastien believed this spread was "highly significant and pathognomonic for organic brain disease." Tr. 241. Dr. Bastien also noted that the scores on her subtests varied markedly, ranging from scores in the 9th percentile to scores in the 99.6th percentile, which was also suggestive of organic brain disease. *Id.*

Plaintiff scored in the 91st percentile on the Information component of the test, but Dr. Bastien thought plaintiff might have problems with memory retrieval anyhow. *Id.* She observed that plaintiff scored at only the 50th percentile on the Digit Span test, able to consistently remember only seven Digits Forward and only three Digits Backwards. *Id.* Dr. Bastien found this indicative of problems in memory and short-term verbal memory processing, which she believed was typical of CFS patients. *Id.* Plaintiff scored in the 99.6th percentile on the Vocabulary component of the exam, which Dr. Bastien described as "terrific." *Id.* Her score on the Arithmetic component was at the 84th percentile, which is also excellent, but far below plaintiff's quantitative thinking score (99th percentile) on her prior IQ exam. *Id.* Similarly, Dr. Bastien found that plaintiff's score on the Comprehension component of the test (63rd percentile) was far below her score on a comparable component (96th percentile) on the prior IQ exam. *Id.*

Dr. Bastien reported that plaintiff's performance on the IQ exam and other tests was consistent with the profile Dr. Bastien had observed in other CFS patients. Tr. 241–44. Plaintiff scored at only the 25th percentile on an eye-hand coordination test. Tr. 242. She scored in the 9th percentile on Picture Completion, a test of visual discrimination. Tr. 241. The Tactual Performance Test found that her right hand was within normal limits, but her left hand was moderately impaired, a pattern Dr. Bastien reported she and other researchers have found in other CFS patients. Tr. 242–43. Plaintiff's tapping and grip strength scores were mildly impaired bilaterally, which Dr. Bastien thought suggested weakness and problems in motor persistence which Dr. Bastien has also found in other CFS patients. Tr. 243.

Dr. Bastien also reported that plaintiff fared poorly on the Halstead–Reitan Neuropsychological test battery, which measures brain dysfunction. Tr. 242–43. Her impairment index of .714 "strongly suggests brain dysfunction." Tr. 243. Her scores indicated significant problems in problem solving and non-verbal abstract reasoning and bordered on being "seriously impaired." *Id.* Dr. Bastien found that on the Wechsler Memory Scale, plaintiff was "severely impaired" on both immediate verbal and delayed verbal memory, yet within normal limits on both immediate and delayed visual memory, a pattern Dr. Bastien believes is typical of other CFS patients. *Id.* Finally, Dr. Bastien noted that plaintiff's MMPI profile is consistent with the profile found by herself and other researchers in CFS patients. Tr. 244.

Dr. Bastien concluded plaintiff "is totally and completely disabled from any gainful employment at present" and meets Social Security listing 12.02 (Organic Mental Disorders). Tr. 244–45. She estimated plaintiff's current GAF at 45.[5] Tr. 246.

After the hearing, the ALJ had plaintiff examined by a clinical psychologist, Dr. Robert Kruger. Tr. 263. Dr. Kruger inter-

---

**5.** The Global Assessment of Functioning Scale ("GAF") ranges from 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for herself). DSM–III–R at 12; Tr. 246. A score between 41 and 50 is defined as manifesting "serious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM–III–R at 12.

viewed plaintiff for about 75 minutes, and reviewed earlier medical reports, but apparently conducted no formal tests of his own. Tr. 263–68. Dr. Kruger observed that plaintiff behaved appropriately and appeared to be well oriented. Tr. 265. She knew what city she was in, her age, the time, the season, the first names of both her mother and father, and Dr. Kruger's name. Id. She was able to recite her ABC's within normal time limits for that exercise. Id. She was able to spell "world" and "house" both forwards and backwards with no difficulty, and could also repeat the days of the week and months of the year both forwards and backwards. Tr. 266. She could repeat six digits forwards and four backwards. Id. She was able to follow a three-stage command to pick up a pencil, raise it in the air, and drop it to the floor. Id. Her memory was "grossly intact". Id. She could name the president, the vice-president, and the governor of Oregon. Id. She could describe what was celebrated on Christmas, Thanksgiving, and Labor Day. Id. She knew what she had for dinner the prior night, and how many ounces were in a pound. Id.

Dr. Kruger found her eye-hand coordination "adequate," observing that plaintiff could touch her thumbs to the correct finger on command. Id. Dr. Kruger also pronounced her math abilities "adequate," noting she was able to calculate the number of quarters in $1.75, nickels in a dollar, and nickels in $1.95. Id. Her abstract reasoning was deemed "adequate," and she did not appear confused. Id.

Dr. Kruger noted that plaintiff's physical symptoms appear consistent with her diagnosis of CFS. Tr. 267. He found no evidence of psychotic or clinical depression. Id. Her level of concentration, retention, and memory abilities were seen as intact. Id. Dr. Kruger then completed a Residual Functional Capacity Assessment ("RFC") that rated plaintiff's abilities either fair, poor, or none in numerous areas, including ability to follow work rules (fair); relate to other workers (fair); deal with the public (fair); use judg-

ment (fair); deal with work stresses (poor or none); function independently (fair); maintain attention/concentration (poor or none); understand, remember and carry out complex job instructions (fair); and reliability (poor or none). Tr. 269–70.

Dr. Kruger made a provisional diagnosis of undifferentiated somatoform disorder. Tr. 268. He estimated her current GAF at 55,[6] and past year GAF at 45, though it is unclear whether the latter was intended to be an independent estimate or was merely restating Dr. Bastien's report. Id. With respect to future employment, Dr. Kruger suggested a half-time position where plaintiff would be able to set her own schedule. Id.

While plaintiff's appeal was pending before the Appeals Council, plaintiff underwent an electroencephalogram ("EEG") administered by Dr. Warren Anderson at Kaiser. Tr. 11. Dr. Anderson found "mild" abnormalities "due to recurrent episodes of polyphotic activity ..." but did not explain the significance of this finding. Id.

### THE ALJ'S DECISION

The ALJ found plaintiff had not engaged in substantial gainful activity since April 27, 1988, and that her insured status for Title II disability purposes continued at least through the date of the hearing. Tr. 24. The ALJ also found that the medical evidence established that plaintiff has severe chronic fatigue syndrome and mild depression, but she did not have an impairment, or combination of impairments, listed in or equal to one listed in Subpart P. Tr. 22, 24. The ALJ found plaintiff's subjective accounts of her work-related limitations not credible. Tr. 23, 24. The ALJ also discounted the opinions of Dr. Bastien and Dr. Schmertzler, both of whom had opined plaintiff was disabled, and portions of the opinions of Dr. Kruger, Dr. Kane, and Dr. Rullman. Tr. 22–23. The ALJ found plaintiff is unable to perform any of her past relevant work, and that claimant's nonexertional limitations do not allow her to perform even the full range of sedentary work. Tr. 25. Nonetheless, the

---

6. A GAF between 51 and 60 is indicative of "moderate symptoms" (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). DSM–III–R at 12.

ALJ found that the Secretary's regulations (i.e., the "grids") "direct a conclusion of 'not disabled.'" *Id.* The ALJ then relied on testimony from a vocational expert to find plaintiff was capable of working as a silk screen printer, electronic solderer, or product packager. *Id.* Finally, the ALJ found plaintiff had not been under a "disability," as defined in the Social Security Act, at any time through the date of his decision. *Id.*

### STANDARD OF REVIEW

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir.1991). The claimant bears the burden of proving disability. *Swenson v. Sullivan,* 876 F.2d 683, 687 (9th Cir.1989). First, the Secretary determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1520(b). In step two the Secretary determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140–41, 107 S.Ct. at 2291; *see* § 404.-1520(c). If the answer is no, the claimant is not disabled.

In step three the Secretary determines whether the impairment meets or equals "one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.; see* 20 C.F.R. § 404.1520(d). If so, the claimant is conclusively presumed disabled; if not, the Secretary proceeds to step four. *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291.

In step four the Secretary determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant can work, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Secretary. In step five, the Secretary must establish that the claimant can perform other work. *Yuckert,* 482 U.S. at 141–42, 107 S.Ct. at 2291; *see* 20 C.F.R. § 404.1520(e) & (f). If the Secretary meets her burden and proves the claimant can perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. § 404.1566.

 The court may not set aside the Secretary's denial of disability insurance benefits unless the Secretary's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *Baxter,* 923 F.2d at 1394. Substantial evidence is "more than a mere scintilla" but "less than a preponderance." *Id.* It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

### DISCUSSION

CFS is a highly controversial topic, both within the medical community and the public at large. A computer search uncovered more than one thousand articles about CFS published in newspapers alone during the last seven years, with countless others appearing in various magazines. Interest in CFS has not been confined to the popular press. More than one hundred articles about CFS have been published in prestigious medical journals.

For purposes of this proceeding, it is neither possible nor necessary to resolve the ongoing debate within the medical community regarding CFS. It is sufficient to note that CFS has been recognized by several courts as a legitimate basis for an award of Social Security disability benefits, providing the claimant's symptom complex is sufficiently disabling. *See Cohen v. Secretary of HHS,* 964 F.2d 524 (6th Cir.1992); *Reed v. Secretary of HHS,* 804 F.Supp. 914 (E.D.Mich.1992). Any debate over the existence of CFS would be academic anyway, since the ALJ accepted the conclusions of plaintiff's doctors that she suffers from severe CFS, even though he ultimately rejected her description of the symptoms of the disorder and how they affect her ability to perform work available in the national economy. Tr. 24–25.

## A. *The Decisional Framework:*

■■■ The ALJ found that the "grids" dictated a finding of "not disabled." Reliance on the grids is appropriate only when the grids accurately and completely describe the claimant's abilities and limitations. *Burkhart v. Bowen,* 856 F.2d 1335, 1340 (9th Cir.1988) (citing *Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir.1985)). Use of the grids is inappropriate where the predicate for using the grids—the ability to perform a full range of either medium, light, or sedentary activities—is not present. *Id.* Here, the ALJ found that plaintiff could not perform even the full range of sedentary activity. Tr. 25. The ALJ was therefore obliged to supplement the grids with the testimony of a vocational expert, and identify specific jobs within the claimant's capabilities. *Burkhart,* 856 F.2d at 1340. The VE's testimony is only valuable to the extent that the hypotheticals posed by the ALJ accurately portray the claimant's individual physical and mental impairments. *Id.* at n. 3.

In response to a hypothetical posed by the ALJ, the VE identified three jobs plaintiff could perform. Tr. 79–80. Upon further questioning, however, the VE testified that if plaintiff's capacity to work is subject to the constraints described in her testimony and the reports of her doctors, then there is no work she can perform in the national economy. Tr. 81–83. The VE acknowledged that none of the jobs he described would permit plaintiff to take a nap most afternoons, which both plaintiff and Ms. Striffler testified she must do on even a good day. Tr. 47, 67, 80–81. The VE also testified that inability to sustain continuous activity would preclude plaintiff from performing the identified jobs, as would even "moderate" impairment of attention and concentration. Tr. 81. Plaintiff also testified that her condition varied considerably, but that at least 25% of the time it was all she could do to get out of bed and get dressed, and it was difficult to predict those days in advance. Tr. 45–47. The VE testified that no employer in the national economy would hire an employee with those limita-

tions. Tr. 83. The VE's conclusion that plaintiff could perform work in the national economy is therefore contingent on finding plaintiff does not have those limitations which the VE acknowledged would preclude her from working. Conversely, if plaintiff's testimony is accepted, then the Secretary has failed to meet her burden of identifying jobs plaintiff can perform and a finding of "disabled" is mandatory. 20 C.F.R. § 404.-1566(b).

## B. *Plaintiff's Credibility:*

■■■ The ALJ "substantially discounted" plaintiff's testimony regarding her illness and the extent to which it impaired her daily life and ability to function in the work force because he found her not credible. Tr. 23–24. The ALJ also discounted the opinions of plaintiff's doctors because he believed their opinions were based entirely upon plaintiff's false account of her symptoms. Tr. 22–24. The ALJ may discount a claimant's subjective complaints, but must give specific reasons for discrediting her testimony, and those reasons are reviewable by the District Court. *See Bunnell v. Sullivan,* 947 F.2d 341, 345–46 (9th Cir.1991) (en banc); *Varney v. Secretary of HHS,* 859 F.2d 1396, 1398 (9th Cir.1988).

### 1. *The Trip to Berkeley:* [7]

The ALJ stated that some three weeks prior to her hearing, "the claimant drove herself over 600 miles to Berkeley, California" to be examined by Dr. Bastien. Tr. 21. The ability to drive 1200 miles round-trip might be viewed as proof of plaintiff's ability to work. Unfortunately, the ALJ's account of the trip was erroneous. Plaintiff did not drive to California, but flew there on a commercial airliner. Tr. 9–10. The level of activity required to sit in an airplane seat for two hours is not inconsistent with her claim of chronic fatigue.

---

**7.** The first two reasons were not specifically included in the ALJ's credibility discussion. However, it is clear from reading the opinion that these "facts" influenced the ALJ's overall assessment of plaintiff's credibility and are therefore fairly considered as part of his credibility determination.

#### 2. *The Assignations in Salem:*

The ALJ stated that plaintiff "has a boyfriend in Salem whom she visits weekly ... driving herself to and from these assignations."[8] Tr. 22. There is no factual foundation for that statement in the record. Plaintiff's uncontradicted affidavit attests that she drives to Salem no more than once every two months.[9] Tr. 9. That level of activity is not inconsistent with her allegations of chronic fatigue.

Salem, the capital of Oregon, is an easy 50–mile drive from Portland on a modern freeway. The real test is not whether plaintiff could drive to Salem once every two months, on a day which she presumably chose because she was feeling well, but whether she could engage in substantial gainful employment.

■ One of the more perplexing aspects of CFS is that sufferers often report that their condition varies considerably from day to day. One day they can function reasonably well, while on another day they may be unable to get out of bed. *See Cohen,* 964 F.2d at 530. The plaintiff in *Cohen* was able to attend law school on a part-time basis, helped found a national CFS support group, and on occasions was even able to go ballroom dancing. *Cohen,* 964 F.2d at 527. Unfortunately, she could not *consistently* perform these activities, and following an evening of exertion might be bedridden for several days. *Id.* at 530. The critical issue in a disability case is the claimant's "capacity for work activity on a *regular and continuing basis.*" *Id.* (emphasis in original), quoting 20 C.F.R. § 404.-1545(b).

Plaintiff testified that her capacity to function varies markedly over both the short and long term. Tr. 44–47. Sometimes she cannot leave the house, but there are also days when she is well enough to drive to the Oregon Coast. Tr. 51. Plaintiff's ability to drive to Salem once every two months is therefore a factor that may be considered by the ALJ in assessing her ability to work, but it is not inconsistent with her description of her illness.

■ Similarly, the fact that plaintiff is able to maintain a limited romantic relationship does not undermine her testimony or preclude a finding of disability. A disability claimant need not vegetate in a dark room in order to be deemed eligible for benefits. *See Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987). Nor should an otherwise eligible claimant be penalized for attempting to maintain some sense of normalcy in her life and a modicum of independence. *See Cohen,* 964 F.2d at 530–31. Only if the level of activity were inconsistent with plaintiff's claimed limitations would these activities have any bearing upon plaintiff's credibility. There is no evidence of that here.

#### 3. *The Droop and Yawn Test:*

The ALJ observed that "claimant demonstrated no sign of fatigue throughout her hearing, which lasted over a (sic) hour and a half." Tr. 23. This is simply a variation of the "sit and squirm" test, which has long been disapproved of in the Ninth Circuit. *See, e.g., Gallant v. Heckler,* 753 F.2d 1450, 1455 (9th Cir.1984). As a practical matter, the "droop and yawn" test has little validity anyway. As plaintiff correctly observes, a Social Security disability hearing is for most claimants a once-in-a-lifetime experience. The fact that adrenaline gives the claimant enough energy to remain alert and focused for an hour and a half under these conditions says nothing about her ability to function daily in a work setting. Use of the "droop and yawn" test may not be so prejudicial as to require mandatory reversal, *see Nyman v. Heckler,* 779 F.2d 528, 531 (9th Cir.1985), but under these facts neither can it constitute "substantial evidence" supporting the Secretary's decision or his credibility findings.

---

8. Plaintiff objects to the ALJ's use of the term "assignation" because it connotes a meeting for the purpose of "illicit sexual relations." Plaintiff's Opening Brief at 5. The word may have been poorly chosen, but I am satisfied it does not reflect any bias on the part of the ALJ.

9. Plaintiff met her friend through a CFS support group, so he likely has CFS as well. Tr. 265. That could explain why they only see each other once a month, with him commuting to Portland one month and plaintiff typically reciprocating the next. Tr. 10.

#### 4. *The Multiple Inconsistencies:*

The ALJ stated that the "most compelling evidence" regarding plaintiff's credibility consists of "multiple inconsistencies between her testimony and her statements to treating physicians." Tr. 23. At the hearing, plaintiff was describing her life before the onset of her illness. She was then asked, "In 1987 then what kinds of things began happening to you?" Tr. 41. She replied, "I had symptoms of fatigue, disorientation. I wanted to lie down all the time. Nausea. Sore throat. Swollen lymph nodes. Muscle aches." Tr. 41–42 (spelling errors in transcript corrected). The symptoms she had described to her doctors in early 1988 included fatigue, disorientation, disequilibrium, disorientation, nausea, sore throat, and swollen lymph nodes, but did not include muscle aches. Tr. 173.

The ALJ thought the discrepancy between her testimony in 1992 and her description of her symptoms in March 1988 was highly significant and raised serious doubts regarding plaintiff's credibility. Tr. 23. There is no basis for drawing such an inference. Although plaintiff initially did not complain of muscle aches, she has complained of them on many occasions since. *See, e.g.,* Tr. 141. When plaintiff was asked in 1992 to describe "what kinds of things began happening to you," she started describing her symptoms without distinguishing the precise date that each ensued. Plaintiff either did not recall that her muscle aches began somewhat later than some of the other symptoms, or simply construed an ambiguous question as an open-ended request to describe her symptoms. There is no evidence of deception here.

The ALJ may have thought plaintiff was trying to enhance her disability claim by adding additional symptoms often described by persons who complain of CFS. In that case, plaintiff did a poor job because she neglected to add "headache" to the list of her symptoms. That symptom is on the list of common symptoms described in the CDC case definition,[10] a fact plaintiff would almost certainly have known since she was a member of a CFS support group. Tr. 186. Nonetheless, plaintiff did not mention that symptom during her testimony, nor has she complained of headaches during any of the examinations plaintiff has undergone over the past five years, or in the many questionnaires she has completed. There is no reason to believe plaintiff was attempting to score forensic points by asserting she had muscle aches in 1987, when that symptom developed some time later. The discrepancy, if there was one, between plaintiff's account of her symptoms in 1988 and her testimony in 1992 appears to be an honest mistake, and is not a basis for discrediting plaintiff's testimony.[11]

#### 5. *The Best of Times and the Worst of Times:*

The ALJ found that plaintiff had "testified inconsistently that her condition had gradually improved since April 1988, then stated that she had hit bottom at the end of winter and early spring 1991." Tr. 23. In fact, plaintiff testified that her condition was "gradually getting better" but she still had "a lot of ups and downs." Tr. 44, 57. The ALJ then asked when plaintiff "hit bottom." Tr. 44. Plaintiff replied that she had several periods "equally bad," one during her last few months at work, one in early 1989, and another in early 1990. *Id.* The ALJ asked whether plaintiff had experienced similar episodes during 1991 or 1992. *Id.* Plaintiff responded that there had been periods during those last two years when she had been very sick, but "not as sick as I was during those earlier three years." *Id.* In other words, plaintiff thought that on the whole her condition was improving somewhat, but there had been a few setbacks along the way.

---

10. Holmes, Kaplan, Gantz, et al., *Chronic Fatigue Syndrome: A Working Case Definition,* 108 Ann.Intern.Med. 387 (1988).

11. If the Secretary has any doubts about the case with which honest mistakes can occur, she need look no further than her own brief, which refers twice to the findings of Dr. Martin Kehrli as if he were one of plaintiff's treating physicians. Defendant's Memorandum at 4, 12. In fact, Dr. Kehrli was a consulting physician employed by the Disability Determination Services unit. He was not plaintiff's treating physician, he never examined her, and he did not diagnose her with CFS, as was asserted in defendant's memorandum. *Id.* at 4.

There is nothing inconsistent about that testimony.

### 6. *The Case of the Impulsive Plaintiff:*

The ALJ next asserted that plaintiff's testimony was contradicted by Dr. Bastien's report. Tr. 23. Dr. Bastien had speculated that plaintiff might have a problem with impulse control because, when asked what she would do if she was the first person to see smoke and fire while in a movie theater, plaintiff answered, "Yell fire." Tr. 241. During the hearing, the ALJ mentioned Dr. Bastien's hypothesis and then asked plaintiff whether she often does things she regrets. Tr. 61–62. The plaintiff said no. Tr. 62. The ALJ persisted in asking whether plaintiff often acted on an impulse. *Id.* Plaintiff responded, "No. No. She [Dr. Bastien] may have you know found something in her testing of me that I'm not aware of, but that's not something I'm aware of." *Id.*

The ALJ could have viewed this exchange as enhancing plaintiff's credibility because she declined the opportunity to endorse additional symptoms that did not accord with those she was feeling. At worst, the ALJ might have viewed this exchange as evidence that plaintiff is not always aware of how other people view her. Instead, the ALJ implicitly found this minor difference of opinion was evidence of untruthfulness by plaintiff, and cited this as a reason to disregard plaintiff's entire testimony as well as the opinions of her doctors which were largely based upon her subjective complaints. Tr. 23–24. That was erroneous.

### 7. *Personality/Credibility:*

The final reason the ALJ cited for doubting plaintiff's testimony was that her friend, Stephanie Striffler, "contradicted Dr. Bastien in testifying that the claimant was no different personality-wise than she had been before her illness." Tr. 23. The ALJ was presumably referring to a paragraph in Dr. Bastien's report which concludes that as a result of her illness plaintiff has become more irritable, with a low frustration tolerance, and has become more impulsive. Tr. 244.

This purported conflict between the testimony of Ms. Striffler and Dr. Bastien is not a valid basis for discrediting *plaintiff's* credibility. It was not plaintiff's testimony that was in question here.

In any event, the alleged conflict between the testimony of Ms. Striffler and Dr. Bastien was greatly overstated. For one thing, the ALJ does not mention that Ms. Striffler immediately qualified her answer by stating that plaintiff's attention span was noticeably shorter. *Id.* I also note that the questions the ALJ asked the witness ("Do you find a different person [than the person you knew before her illness]?", and "How about her personality?") were vague at best. Tr. 68. The ALJ never asked the witness whether plaintiff seemed more irritable, frustrated, or impulsive, so we don't know how Ms. Striffler would have responded.

In summary, Dr. Bastien thought plaintiff had become more impulsive and irritable since her illness. Plaintiff disagreed, but conceded that she was more easily stressed by minor aggravations, Tr. 61, and plaintiff's friend responded to a vague question about changes in plaintiff's personality by noting that her attention span had become shorter, a finding endorsed by both Dr. Bastien and plaintiff. All of this has little bearing upon plaintiff's credibility or her ability to perform work available in the national economy.

### 8. *Facts Supporting Plaintiff's Credibility:*

The ALJ's findings made no mention of evidence tending to support plaintiff's credibility. For instance, the ALJ paid little attention to the testimony of Ms. Striffler, who corroborated critical aspects of plaintiff's testimony. The ALJ gave no reasons for disregarding the testimony of the head of the Oregon Department of Justice special litigation unit. Another fact in plaintiff's favor is that Dr. Bastien found her MMPI profile valid, meaning there was no evidence of attempted deception. Tr. 244. None of the six doctors who examined plaintiff reported any indication of deception on the part of plaintiff.

Plaintiff declined a number of opportunities to score forensic points by endorsing

symptoms that would make her illness appear worse than it was. She repeatedly denied suicidal ideation, severe depression, hallucinations, psychotic episodes, and other symptoms that would have buttressed her disability claim. Tr. 186, 265–66. Plaintiff also rebuffed Dr. Bastien's suggestion that her illness had made her more irritable or impulsive. Tr. 61–62. I earlier noted that plaintiff did not mechanically endorse every reported symptom of CFS.

Throughout this case plaintiff has periodically advised her doctors and the Secretary when she was feeling somewhat better. Tr. 151, 163, 183, 189, 200, 210. That is unusual behavior for a claimant intent on falsely portraying herself as gravely disabled. Plaintiff has also reported her efforts to remain active, e.g., by going to the park or offering writing lessons. Tr. 163, 167.

The ALJ also ignored Dr. Bastien's findings regarding the substantial diminution in plaintiff's IQ. Tr. 241. Dr. Bastien observed that IQ in adults is ordinarily quite stable, and does not change much unless something interferes with brain function. *Id.* The Secretary points to no evidence to the contrary, and the Secretary's own regulations appear to support Dr. Bastien's statement. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 112.00(D) ("Generally, the results of IQ tests tend to stabilize by the age of 16"); Listing 12.02(A)(7) (loss of 15 IQ points as prima facie evidence of organic mental disorder).

Plaintiff's score in the 99.6th percentile on the verbal component appears to negate any inference that she gave less than her best effort during the IQ testing. Tr. 241. Regardless of what one may think of Dr. Bastien's theories about CFS in general, it is clear that *something* has happened to this plaintiff to cause such a significant reduction in her cognitive ability. That change is strong evidence that plaintiff is suffering from a medical condition that is affecting her thought processes, which is precisely what she has been telling her doctors and the Secretary for the past five years. Tr. 173, 185.

Finally, I note that the ALJ never explained why plaintiff would falsely claim to be disabled. This is a plaintiff who studied hard and earned a master's degree in journalism. By all accounts she was quite successful and happy in a challenging job with a comfortable income. Tr. 50, 139, 228–33. There is nothing in the record that explains why plaintiff would deliberately walk away from a job where she was earning $27,000/year, and had consistently received outstanding performance evaluations and annual pay increases, Tr. 139, 228–33, and trade it all for a reclusive life in a small apartment on the meager income she would receive from disability benefits (which there was no guarantee she would even receive). Nor is such behavior consistent with plaintiff's prior conduct. The most plausible explanation is the one the ALJ rejected—that plaintiff was telling the truth when she said she left her job because she was unable to work and had been unable to consistently work ever since.

The Ninth Circuit requires the ALJ to specify any factors discrediting a claimant's testimony at the first opportunity. *Varney*, 859 F.2d at 1398. If the ALJ fails to make specific and justifiable findings in the original decision, the claimant's testimony must be taken as true. *Id.* at 1401 (with one possible exception not applicable here). After reviewing the record as a whole I conclude that the ALJ's credibility findings were fatally tainted by factual, legal, and analytical errors, and are not supported by substantial evidence. I therefore accept plaintiff's testimony as true.

### C. The Opinions of the Medical Doctors:

#### 1. Dr. Kane:

Dr. Kane diagnosed plaintiff with CFS in 1988, and reaffirmed that diagnosis in 1992. Tr. 175, 255. The ALJ implicitly accepted Dr. Kane's opinion by finding that plaintiff has "severe chronic fatigue syndrome." Tr. 24.

#### 2. Dr. Schmertzler:

Dr. Schmertzler advised the Secretary that plaintiff was unable to engage in activities beyond the most sedentary things for more than a total of four to four and one-half hours

per day, required intermittent rests in order to engage in that much activity, and she could not predict the occasions on which she would be able to engage in sustained activity. Tr. 220.

 The testimony of a treating physician is ordinarily accorded considerable deference in the Ninth Circuit. *See Rodriguez v. Bowen,* 876 F.2d 759, 762 (9th Cir.1989). There is an exception, though, when the treating physician's opinion is largely conclusory or based entirely upon the claimant's subjective complaints which are not buttressed by clinical findings. *See Bunnell v. Sullivan,* 912 F.2d 1149, 1153 (9th Cir.1990), *vacated in part on other grounds,* 947 F.2d 341, 348 (9th Cir.1991); *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989). Here, while there were some clinical findings pertaining to low-grade fevers and enlarged lymph nodes, Dr. Schmertzler conceded there are no clinical findings such as X-rays or other diagnostic tests that could either confirm or disprove his opinion. Tr. 219, 220. The treating physician rule is thus inapplicable here.

That does not mean Dr. Schmertzler's opinion can simply be disregarded. On the contrary, Dr. Schmertzler saw plaintiff regularly throughout most of her illness. He alone had the opportunity to listen to her contemporaneous accounts of the course of her illness, and develop an impression of her veracity and her physical condition. There is nothing in his notes from those four years to suggest he distrusted plaintiff's account of her illness, or thought she was faking her illness in an effort to procure disability benefits. Tr. 188–220. On the contrary, Dr. Schmertzler advised the Secretary that he thought plaintiff was sincere about obtaining treatment for her health problems. Tr. 219. That lends further credence to plaintiff's description of her limitations. Moreover, since I have accepted plaintiff's testimony as true, I also credit those portions of Dr. Schmertzler's opinion that were based upon plaintiff's subjective complaints.

3. *Dr. Rullman:*

Dr. Rullman was selected by the Secretary to examine plaintiff. Tr. 258–60. Like Drs. Kane and Schmertzler, Dr. Rullman found that plaintiff "probably fulfills the usual major and minor criteria" for diagnosing CFS, based upon plaintiff's self-report of her condition. Tr. 260.

D. *The Opinions of the Psychologists:*

The opinions of the psychologists are arguably superfluous if plaintiff's physical limitations prevent her from consistently working an eight-hour day. I have nonetheless reviewed the ALJ's psychological findings because they may shed further light on plaintiff's condition.

1. *Dr. Bastien:*

The ALJ obviously discounted Dr. Bastien's opinion, referring to her as a CFS "specialist" (quotations supplied by the ALJ), and as "the carefully selected chronic fatigue syndrome advocate and psychologist in California." Tr. 21, 23. The ALJ's statements were presumably based upon innuendo, since there is no evidence in the record that impugns Dr. Bastien's professional qualifications, or depicts her as a CFS "advocate." Innuendo is not a proper basis for impeaching Dr. Bastien's opinion.

Dr. Bastien's opinion can be divided substantively into five segments. The first segment includes the results of the standardized tests administered to plaintiff. Tr. 240. The Secretary does not contend that Dr. Bastien was unqualified to administer those tests, that the tests were improperly administered, or that the results were incorrectly reported.

The second segment consists of Dr. Bastien's interpretation of those test results with respect to plaintiff's mental status. Dr. Bastien concluded plaintiff had significant difficulties in problem solving and non-verbal abstract reasoning and bordered on being "seriously impaired." Tr. 243. Plaintiff was also "severely impaired" on both immediate and delayed verbal memory, and had problems with concentration, visual-spatial perception, sequencing, memory difficulties, motor impairment, and abstract reasoning im-

pairment. Tr. 243–45. Dr. Bastien estimated plaintiff's GAF at 45.

The ALJ disputed those findings, citing the report of Dr. Kruger, a clinical psychologist who interviewed plaintiff at the Secretary's behest. Tr. 23. Dr. Kruger's examination was rather cursory in comparison to the detailed tests conducted by Dr. Bastien. His performance tests seem overly simple. Tr. 265–66. Plaintiff would have to be grossly impaired before she would be unable to recall her own name, or that of the President of the United States, or incapable of reciting the alphabet. *Id.* I do not take Dr. Bastien's report to suggest plaintiff's disabilities are of that magnitude. Similarly, it is not difficult to calculate the number of quarters in $1.75. Tr. 266. Dr. Kruger's testing may demonstrate that plaintiff is in touch with reality and can perform simple intellectual skills, but no one has suggested otherwise.

I also question the degree to which Dr. Kruger's report actually conflicts with that of Dr. Bastien in their assessment of her cognitive abilities. Dr. Bastien's findings primarily focused upon the disparity between plaintiff's pre-morbid capacity and her present capacity, and plaintiff's ability to perform under pressure in a work environment, neither of which appear to have been adequately addressed by Dr. Kruger's tests. Dr. Kruger did conclude that her GAF was 55, while Dr. Bastien estimated it at 45, but that probably had more to do with their differing assessment of plaintiff's other emotional problems.

Moreover, Dr. Kruger completed a Residual Functional Capacity Assessment ("RFC") that rated plaintiff's ability to maintain attention/concentration (poor or none); to understand, remember and carry out complex job instructions (fair); and reliability (poor or none). Tr. 269–70. The VE testified that even moderate deficiencies in attention/concentration would preclude plaintiff from performing the identified jobs, and that excessive absences would preclude employment as well. Tr. 81–83. Thus if Dr. Kruger's RFC

is accepted, it provides an additional basis for finding plaintiff disabled. The ALJ dodged this issue by postulating that Dr. Kruger's RFC did not reflect his own opinion of plaintiff's condition but rather that of Dr. Bastien. Tr. 22. However, Dr. Kruger was hired by the Secretary for the express purpose of conducting his own evaluation of plaintiff's condition. Tr. 85. To the extent his report incorporated Dr. Bastien's findings, Dr. Kruger implicitly accepted them as true. Either Dr. Kruger lacked sufficient information to dispute Dr. Bastien's findings, or he agreed with them. In either case, Dr. Kruger made no findings of his own that directly contradict those of Dr. Bastien.

The third segment of Dr. Bastien's report consisted of her assessment of plaintiff's emotional state. Dr. Bastien concluded that plaintiff's depression and anxiety were being adequately controlled by anti-depressants, and should not preclude her from working. Tr. 237, 244. That is the same conclusion reached by Dr. Kruger. Tr. 267. Dr. Bastien also found plaintiff had become impulsive, irritable, socially isolated and withdrawn, and was under extreme stress. Tr. 245–46. Dr. Kruger thought plaintiff seemed generally well adjusted, and was only under moderate stress. Tr. 266–68. Plaintiff does not cite this as a basis for her disability claim, so this segment has little relevance to the disability determination decision.

The fourth segment of Dr. Bastien's report includes her attempts to extrapolate the results of her tests to confirm the diagnosis of CFS. Specifically, Dr. Bastien asserted that plaintiff's test results were consistent with a test profile she and other researchers have found in many other CFS patients. Tr. 241–44. The ALJ clearly gave no credence to Dr. Bastien's theory, even though there was no controverting evidence in the record from any other expert. The ALJ should not have dismissed Dr. Bastien's findings so lightly, without providing any explanation of his reasoning.[12]

---

12. The Secretary may wish to review a recent study which found that subjects with CFS performed significantly worse than healthy controls on various neuropsychological tests. Deluca, Johnson, and Natelson, *Information Processing*

*Efficiency in Chronic Fatigue Syndrome and Multiple Sclerosis*, 50 Arch.Neurol. 301 (March, 1993) ("Deluca"). Deluca reported that the pattern of performance on these standardized tests was somewhat similar to that found in patients

The final segment of Dr. Bastien's report consists of her conclusion that plaintiff is disabled because she meets the criteria for Listing 12.02. That conclusion was legally incorrect. Although plaintiff meets the first requirement of Listing 12.02, she fails the second requirement because the restrictions in activities of daily living must *result* from the claimant's mental impairments. 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 12.02(B). Here, the evidence suggests that any restrictions in plaintiff's ability to perform activities of daily living primarily results from fatigue rather than mental impairments.

### 2. Dr. Kruger:

Most of Dr. Kruger's report has been discussed elsewhere, but two additional findings merit attention. First, Dr. Kruger concluded that plaintiff's symptoms were consistent with those of CFS as defined in the latest medical literature. Tr. 267. Second, Dr. Kruger thought that in light of plaintiff's mental and physical limitation it might be "advisable" for her to work a "half-time position whereby she would be able to set her own schedule." *Id.* The implication is that plaintiff is unable to consistently work a normal eight-hour day. That is further evidence that plaintiff is disabled.

### E. The EEG:

While plaintiff's appeal was pending before the Appeals Council, plaintiff underwent an electroencephalogram ("EEG") administered by Dr. Warren Anderson at Kaiser. Tr. 11. Dr. Anderson found "mild" abnormalities "due to recurrent episodes of polyphotic activity ..." but did not explain the significance of this finding. *Id.* I am not qualified to interpret an EEG, or determine how it affects plaintiff's capacity to work. Absent proper interpretation by a qualified physician, this information is meaningless.

### F. The Vocational Expert's Opinion:

The VE testified that plaintiff is incapable of performing any of her past relevant work. *Id.* At this point, the burden shifts to the Secretary to demonstrate that plaintiff can perform other jobs available in the national economy. *Yuckert,* 482 U.S. at 141–42, 107 S.Ct. at 2291; 20 C.F.R. § 404.1566. The VE testified that plaintiff could still perform entry-level unskilled jobs such as silk screen printer, electronic solderer, or production packager. Tr. 79–80. Several aspects of the VE's testimony trouble me.

First, I am hard-pressed to distinguish the job requirements of a sandwich maker (which the VE testified plaintiff could not perform) and a production packager (which the VE found plaintiff could perform). My intuitive perception of the requirements of those jobs is borne out by their description in the United States Department of Labor's Dictionary of Occupational Titles, Fourth Edition ("DOT").[13] Compare Occupational Code 317.664–010 (Sandwich Maker) and 920.587–018 (Packager, Hand) (which appears to most

---

with multiple sclerosis ("MS"), except the CFS subjects showed even more impairment than MS subjects on some of the tests. For the most part, verbal abstract reasoning was not impaired, but CFS patients scored significantly below controls on both the Paced Auditory Serial Addition Test (PASAT) and the Digit Span Test, and significantly higher than controls on the Beck Depression Inventory (BDI).

Those findings appear to be consistent with the outcome predicted by Dr. Bastien. Tr. 241. Deluca also found that subjects with CFS or MS show significant impairment on a test of complex concentration when compared with appropriate controls. Deluca postulated that subjects with MS or CFS have difficulty on tasks that require the simultaneous processing of complex cognitive information, and that selective impairment in information processing efficiency may lie at the root of other cognitive complaints made by

patients with CFS. Again, the findings of the Deluca study appear to lend support to Dr. Bastien's observations.

In fairness to the ALJ, the Deluca study was not published until March, 1993, long after the ALJ had filed his opinion. The Secretary has therefore not had an opportunity to review this study, nor has it been interpreted by medical experts who are better able than I to discern its ultimate importance. I have therefore not relied upon this study in formulating my recommendation in this case.

**13.** The Secretary's regulations regularly reference the DOT and incorporate its provisions, including its definitions of terms such as "sedentary", "light", and "medium". 20 C.F.R. §§ 404.1566–69.

closely fit the VE's proposed "production packager").

Second, all three jobs the VE found suitable for plaintiff are described in the DOT as requiring the capacity to perform either light or medium work. *See* Code 920.587–018 (Packager, Hand) (strength: medium); Code 813.382–101 (Solderer, Electronic) (strength: medium); Code 979.684–030 (Silk–Screen Printer) (strength: light). However, the ALJ's hypothetical asked the VE to assume plaintiff could *not* perform work in even the sedentary level of exertion. Tr. 79. *Accord* Tr. 25 (finding plaintiff cannot perform even the full range of sedentary work). There appears to be a conflict between plaintiff's physical limitations and the requirements of the jobs as outlined in the DOT. The VE may have had a valid reason for believing plaintiff could still perform these jobs, but it was not stated in the record.

Third, I have already concluded that the ALJ's base hypothetical on which the VE's opinion was predicated did not convey the full extent of plaintiff's limitations. Nonetheless, the VE was then asked several additional obstacles that more properly reflected plaintiff's limitations. Tr. 78–83. The VE's answers make it unnecessary to remand for additional testimony.

Next, the VE erroneously assumed plaintiff need only be able to work "four to six hours out of an eight hour day". Tr. 83. That is incorrect. The Ninth Circuit has never found that the ability to work but four hours of an eight-hour day is sufficient for purposes of the fifth step of the *Yuckert* analysis. *See Rodriguez*, 876 F.2d at 762 (claimant who could only work four hours a day was presumptively disabled).

Finally, I note that the VE did not identify any jobs existing in sufficient numbers in the national economy that permit plaintiff to set her own schedule, a restriction suggested by the ALJ's own psychologist. Tr. 267.

G. *Disposition:*

■ The VE testified that if plaintiff's capacity to work is subject to the constraints described in her testimony and the reports of her doctors, then there is no work she can perform in the national economy. Tr. 81–83. The ALJ failed to articulate a legally sufficient basis for discrediting either the plaintiff's testimony or the opinions of her doctors with respect to the underlying issues in this case. I conclude that the ALJ's decision is not supported by substantial evidence in the record, nor is there anything to be gained by remanding this case to the Secretary for further fact-finding. *See Varney*, 859 F.2d at 1401. The Secretary has clearly not met her burden of establishing that plaintiff can consistently work an eight-hour day at a job available in sufficient numbers in the national economy, and further testimony is unlikely to produce a contrary result. Plaintiff is therefore disabled, *see Yuckert*, 482 U.S. at 141–42, 107 S.Ct. at 2291; 20 C.F.R. §§ 404.-1545(b), 404.1561, 404.1566(b), and has been since April 27, 1988. There is nothing more for the Secretary to do but calculate an award of benefits.

### CONCLUSION

The decision of the Secretary should be reversed and remanded for a determination of benefits.