**George W. MITCHELL, Plaintiff,**

v.

**EASTMAN KODAK COMPANY, Defendant.**

No. 1: CV–93–840.

United States District Court, M.D. Pennsylvania.

Dec. 14, 1995.

Timothy J. O'Connell, Harrisburg, PA, for plaintiff.

Thomas E. Wood, Bradford Dorrance, Keefer Wood Allen & Rahal, Harrisburg, PA, for defendant.

## MEMORANDUM

McCLURE, District Judge.

## BACKGROUND

Plaintiff George W. Mitchell filed this ERISA action[1] to recover long-term disability benefits which he alleges are owed to him under the Kodak Long Term Disability Plan (the plan) provided by his former employer, defendant Eastman Kodak Company (Kodak). Metropolitan Life Insurance Company (Metropolitan Life) is the claims administra-

tor responsible for making eligibility determinations in the first instance. Its decisions are reviewed by Kodak, the plan administrator.

Mitchell was employed by Kodak from June 4, 1972 through January 12, 1989 as a field engineer. Plaintiff alleges that he became unable to work following a flu-like illness which he suffered in the late summer/fall of 1988. He alleges that he suffers from chronic fatigue syndrome (CFS), which renders him unable to work and that on that basis, he is qualified for long-term disability payments under the plan. Plaintiff applied for, and began receiving, short-term disability benefits from Kodak in January, 1989, shortly after the onset of his illness. No determination of eligibility was necessary to qualify for the receipt of such benefits. Short-term disability benefits are paid out automatically upon notification of an employee's sickness, injury or disability. Approval from the claims administrator is not necessary.

Plaintiff's eligibility for short-term disability benefits ended on June 26, 1989. His application for long-term disability benefits was denied by the claims administrator on June 9, 1990. On appeal to the plan administrator, the denial was affirmed.

Plaintiff brought this action to challenge Kodak's denial of long-term disability benefits. He contends that he has proven all elements necessary to establish that he is entitled to long-term disability benefits under the terms of the plan.

The parties filed cross motions for summary judgment.[2] After considering the parties' motions, this court remanded the case to the plan administrator for further factual findings after the parties were given an opportunity to supplement the record. See generally: *Quesinberry v. Life Insurance Company of North America*, 987 F.2d 1017,

---

[1]. The Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (West 1994), governs employee benefit plans.

The plaintiff is empowered to bring this action by § 1132 of ERISA, which provides in relevant part: "A civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan...." 28

U.S.C. § 1132(a)(1)(B). This action was originally filed in the Court of Common Pleas of Union County, Pennsylvania on May 7, 1993 and subsequently removed to this court.

[2]. Plaintiff's motion was filed to record document no. 12. Defendant's motion was filed to record document no. 13.

1025 n. 6 (4th Cir.1993) (recognizing availability of remand where appropriate).

While the case was on remand: 1) plaintiff supplemented the record with a report from his treating physician dated August 19, 1994; 2) no additional medical evidence was submitted by defendant; 3) in a letter to plaintiff's counsel, Timothy J. O'connell, Esq., dated April 12, 1995, the plan administrator denied plaintiff's claim for benefits (record document no. 23, exhibit "B").

The case is now again before us on the parties' cross-motions for summary judgment pursuant to plaintiff's petition to re-open his motion for summary judgment. That petition was granted by the court in an order dated August 23, 1995. For the reasons which follow, we conclude that plaintiff is entitled to summary judgment in his favor.

## DISCUSSION

### Summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 323 and 325, 106 S.Ct. at 2552 and 2554.

Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

### Standard of review

In our prior memorandum,[3] we determined, based on the plan provisions in the documents then before us, and on the nature of the issue before us, that our review was *de novo.* Eastman Kodak has now supplemented the record with a copy of the amendments to the plan which became effective on April 14, 1991. Defendant states that it did not file the amendments earlier because it was under the impression that the standard of review was not in dispute. Defendant's request to supplement the record is reasonable, and we will consider the 1991 amendments attached to its response to the motion to reopen summary judgment as part of the record currently before the court.

The standard of review applied by this court turns on the nature of the authority held by the plan administrator to determine benefit eligibility. *Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176, 1180 (3d Cir.1991) and 29 U.S.C. § 1132(a)(1)(B). "Where an ERISA plan grants it's administrator the power to inter-

---

**3.** Record document no. 22.

pret and construe the plan and decide questions as to eligibility, the arbitrary and capricious standard applies." *Scarinci v. Ciccia,* 880 F.Supp. 359, 364 (E.D.Pa.1995).

■ The "arbitrary and capricious" standard is essentially the same as an "abuse of discretion" standard: the court can overturn the decision of the plan administrator only if it was made "without reason" and is "unsupported by substantial evidence or erroneous as a matter of law." The court's scope of review is narrow, and it is not at liberty to substitute its own judgment for that of the administrator. *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993).

■ A modified arbitrary and capricious standard applies if there is evidence that the plan administrator had a conflict of interest. *Scarinci,* 880 F.Supp. at 364, citing *Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1173 (3d Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992). See also: *DiMichelle v. Travelers Insurance Company,* 1993 WL 481713 at *5 (E.D.Pa. Nov. 17, 1993). A conflict of interest may exist if the employer is self-insured and acts as the plan administrator or if the insurance company acting as a fiduciary with discretionary power to determine the eligibility of claimants for plan benefits pays claims out of its own assets. See, e.g., *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir.1991). However, "[t]he mere fact that an employer acts as the administrator of its own ERISA plan is not significant enough to warrant a heightened standard of review." *Scarinci,* 880 F.Supp. at 364, citing *Abnathya,* 2 F.3d at 45 n. 5 and *Jordan v. Retirement Committee of Rensselaer Polytechnic Institute,* 46 F.3d 1264, 1274 (2d Cir.1995). See also: *Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987) ("the ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and employer") and 29 U.S.C. § 1003(a).

In determining whether such a conflict existed, the Third Circuit, in *Abnathya,* looked to how the plan was funded and benefit monies paid out. In that case, the employer, Hoffmann–La Roche, Inc. (Hoffman) made fixed contributions to the plan fund, which was held by a separate trustee. Monies in the fund could be used only "for the exclusive benefit of Members under this Plan or for the payment of expenses of the Plan and the Fund." *Abnathya,* 2 F.3d at 45 n. 5. "Hoffman therefore incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits." *Id.,* citing *Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452, 1459 (10th Cir.1991) (no conflict of interest existed where the employer/plan administrator did not have the right to obtain any reversion from the fund). The Third Circuit also noted that there was "no evidence of bad faith on the part of Hoffman." *Id.,* citing *Nazay v. Miller,* 949 F.2d 1323, 1335 (3d Cir.1991) (no conflict exists where there was no demonstration of bad faith on the part of the employer coupled with an incentive to avoid unjustified denials of benefits to maintain employee morale). After weighing these factors, the Third Circuit concluded: "Although some degree of conflict inevitably exists where an employ acts as the administrator of its own employee benefits plan, the conflict here is not significant enough to require special attention or a more stringent standard of review under" *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). *Abnathya,* 2 F.3d at 45 n. 5.

### Eastman Kodak plan

Our prior conclusion that the standard of review is *de novo* was based on two considerations: 1) the absence of a plan provision vesting discretionary authority in the plan administrator; and 2) the existence of purely factual issues.

Eastman Kodak's supplementation to the record after the remand includes plan amendments which define the authority conferred on the plan administrator to make eligibility determinations. Section 8.03 of the Eastman Kodak plan, as amended, provides:

> In reviewing the claim of any participant, the Plan Administrator shall have full discretionary authority to determine all ques-

tions arising in the administration, interpretation and application of the plan. In all such cases, the Plan Administrator's decision shall be final and binding upon all parties.

(Record document no. 26, exhibit "B")

Section 8.03, as amended, plainly vests discretionary authority in the plan administrator. See, e.g. *Abnathya,* 2 F.3d at 45 (discretion found where plan gave benefit committee "power to interpret and construe the Plan ... and to determine all questions relating to eligibility ... for disability income benefits.") and *Nazay,* 949 F.2d at 1335 (discretionary authority found based on authority to "interpret and construe provisions ... determine eligibility ... make and enforce rules ... decide questions"); and *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119 n. 5 (3d Cir.1990) (discretion found based on authority to "administer ... decide all questions," interpret and apply terms).

■ If, however, a conflict of interest is apparent, we would be justified in applying a heightened degree of scrutiny, *Scarinci,* 880 F.Supp. at 364. Here, the funding arrangements under the Eastman Kodak plan track those followed in the Hoffman plan under scrutiny in *Abnathya.* Section 8.01 of the plan provides that:

> The Plan is sponsored and maintained on an uninsured basis by Eastman Kodak Company ...
>
> ....
>
> The Eastman Kodak Company has entered into a trust agreement creating the Kodak Welfare Benefit Plans Trust pursuant to Section 501(c)(9) of the Internal Revenue Code of 1986. Chase Lincoln First Bank, N.A. serves as a trustee and holds the assets of the trust pursuant to the trust agreement. Fund assets held by the trustee may not be used for any purpose other than for the exclusive benefit of persons entitled to benefits under the Plan and for reasonable expenses of administering the Plan.

(Record document no. 26, exhibit "B", ¶ 8.01). Based on the similarities between the two plans and the absence of other evidence of a conflict of interest on the part of Kodak, we conclude that the more stringent standard of review does not apply and that analysis under the arbitrary and capricious standard is appropriate.

■ The other basis for the conclusion that our standard of review is *de novo* was that only factual determinations are at issue. Our holding was based on the Third Circuit's decision in *Luby,* 944 F.2d at 1183, which declared purely factual issues subject to *de novo* review. The court stated:

> Plan administrators are not governmental agencies who are frequently granted deferential review because of their acknowledged expertise. Administrators may be laypersons appointed under the plan, sometimes without any legal, accounting, or other training preparing them for their responsible position, often without any experience in or understanding of the complex problems arising under ERISA, and ... little knowledge of the rules of evidence or legal procedures to assist them in factfinding.
>
> .... [The court's holding] is consistent with *Firestone* and its emphasis on the goals of ERISA: to protect the interests of plan members and their beneficiaries. We believe these interests are better served when plan administrator's factual determinations are accorded no deference, but subject to *de novo* review.

*Luby,* 944 F.2d at 1183–84. Accord: *Pierre v. Connecticut General Life Insurance Company,* 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991), (White, J), (dissent from denial of *certiorari* ), ("Since our decision in *Bruch* [*Firestone* ], a disagreement has developed in the Courts of Appeals concerning the standard of review to be applied when a benefits decision turns on the facts of the case, rather than the interpretation of the terms in the ERISA plan. The Third and Fourth Circuits have held that a decision of a plan administrator should be reviewed de novo.") The circuits are split on the question of whether the *Firestone* standard applies to purely factual issues. For a list of cases, see: *Pettit v. Olin Corporation,* 1994 WL 525964 at 1 (W.D.Mo. Sept. 26, 1994).

Eastman Kodak argues that the *Luby* decision was undermined on this point by the

Third Circuit's decision in *Abnathya*, in which the more deferential "arbitrary and capricious" standard was applied even though the only issue was purely factual, i.e. the extent of plaintiff's disability.

■ *Abnathya* was decided by a different panel of judges and did not mention the apparent conflict with *Luby* on this point. In such cases, the earlier holding remains valid law unless and until it is expressly overruled by the court. *Luby*'s holding that purely factual issues are to be reviewed *de novo*, therefore, stands and we will review the plan administrator's denial of benefits under that standard.

Under Third Circuit Internal Operating Procedure 9.1, a panel cannot overrule the holding of a prior published opinion. Only an *en banc* ruling can overturn a prior published opinion. See: *Riley v. Simmons*, 45 F.3d 764, 772 n. 7 (3d Cir.1995); *Hammond v. Commonwealth Mortgage Corp. of Am.*, 27 F.3d 52, 57 (3d Cir.1994). To the extent that the decision of a later panel conflicts with prior Third Circuit precedent, this court remains bound by the earlier, not the later, decision. *United States v. Monaco*, 23 F.3d 793, 803 (3d Cir.1994).

### Denial of benefits

■ The plan administrator based his original denial of benefits on the lack of "objective medical evidence that ... [plaintiff's] condition made ... [him] totally and continuously unable to engage in *any* substantial gainful work for which ... [he was] qualified as of June 26, 1989." (Plaintiff's complaint, exhibit "B") The critical date for determining eligibility is June 26, 1989. Coverage under the plan ceased on that date, the date when his employment under the plan terminated. Eastman Kodak plan, ¶ 2.06.

The only additional evidence filed on remand was the report of Dr. Gantz. After

reviewing the record as a whole, the plan administrator again concluded that plaintiff had not established that his medical condition rendered him unable to engage in "any substantial gainful employment." (Record document no. 23, exhibit "B") That opinion was expressed in a letter dated April 12, 1995 from David E. Edwards, Director of Benefits. Edwards concludes that Mitchell has "failed to provide any objective medical evidence that his condition made him totally and continuously unable to engage in *any* substantial gainful work for which he was qualified as of June 26, 1989." *Id.*

### Evidence of plaintiff's disability and resulting impairment

■ Mitchell bears the burden of proving that he fulfills the plan requirements for receipt of long term disability benefits. In order to qualify for long-term disability benefits under the Eastman Kodak plan, Mitchell must establish that he is: 1) "totally and continuously unable to engage in any substantial Gainful Work for which he is, or becomes, reasonably qualified by education, training, or experience" and 2) that the disability has lasted for a continuous period of 26 weeks inclusive of time during which Short–Term Disability benefits and Workers Compensation Income Replacement benefits were paid (except where a Participant is involuntarily terminated from the Employer as the result of a layoff, a divestiture, or a special separation plan) or "has lasted for less than 26 weeks, but can be reasonably expected to last for a total of at least 26 weeks," or "is expected to result in death." (Plaintiff's complaint, exhibit "A," ¶ 2.06. Hereafter referenced as Eastman Kodak plan, ¶ ___.) [4]

For the reasons stated above, our review is *de novo*, since the only issue before us is factual. Mitchell relies on the medical rec-

---

4. Although there are additional requirements, none is directly at issue here. In addition to the requirements stated above, the applicant must establish that he or she: 1) has "one year of Continuous or Adjusted Service on or before the last day worked before the onset of Disability (except in the case of compensable occupational Disabilities); 2) has not "reached normal retirement date;" 3) has a disability "which did not result from an act of war or participation in an

insurrection, rebellion, or riot; 4) has applied "for Primary ... Social Security Disability Insurance Benefits (SSDIB) ... except that an SSDIB application is not required as long as the Disability is not expected to last 12 months ...;" 5) remains "under the care of a licensed physician;" and 6) has furnished "proof of continuance of Disability, as required by the claims administrator named in Section 7.01." (Eastman Kodak plan ¶ 4.01.)

ords and reports of his treating physicians. Dr. J. Lawrence Ginsburg, Dr. Gerald Gordon, Dr. Gary M. Wolfe, and Dr. Nelson M. Gantz to establish his medical condition. The date of the onset of disability is critical. Under the plan requirements, plaintiff qualifies for benefits only if he was disabled, as defined by the plan, on June 26, 1989.

### Medical evidence of disability

Plaintiff was diagnosed as suffering from chronic fatigue syndrome by Dr. Gordon on January 30, 1989 after an examination at Geisinger Medical Center. (Reproduced record at pp. 26–27).[5] Dr. Gordon concludes his discussion of plaintiff's condition by stating: "The patient has chronic fatiguing illness. Laboratory studies including VCA of 1:640 against EB virus was noted from information sent by Dr. Ginsburg." Dr. Ginsburg was plaintiff's primary care physician. Dr. Gordon conducted further follow-up testing to attempt to discern the cause of plaintiff's symptoms. The results did not indicate any clear basis for the extreme fatigue plaintiff described experiencing.

In a letter to Dr. Ginsburg dated February 15, 1989, Dr. Gordon reports that his evaluation "does not really help me define further what the cause of Mr. Mitchell's fatigue is." He goes on to report the specifics of various tests, most of which were negative or within normal limits. (Reproduced record at p. 29) He concludes by stating: "At the moment, I cannot find a clear infectious cause for the process that Mr. Mitchell has presented to you with." (Reproduced record at p. 29) There are numerous follow-up consultations with Dr. Ginsburg and other physicians. Dr. Wolfe also subsequently diagnosed plaintiff as suffering from Epstein–Barr fatigue.

During none of these examinations was a direct cause for plaintiff's condition found. Plaintiff continued to report the same symptoms, chiefly intermittent fevers and overwhelming fatigue through June 26, 1989.

The physicians' inability to pin down plaintiff's condition down to a specific cause is not surprising, given the nature of his condition. Chronic fatigue syndrome is a debilitating immunological disorder which is frequently difficult to diagnosis. The illness consists principally of a cluster of symptoms exhibited over a period of time. Often it is only when other, more obvious, causes are ruled out, e.g. flu, a viral infection, depression, that a definitive diagnosis is made. See: *Sisco v. Sullivan,* 10 F.3d 739, 744 (10th Cir.1993) (CFS "cannot be conclusively diagnosed in a laboratory setting.... At this point there is no 'dipstick' laboratory test for chronic fatigue syndrome.")

> The first method of diagnosis of this type was set forth in 1988 in the Annals of Internal Medicine, Vol. 108, Jan.–March 1988. The "operational" diagnosis technique used by the medical community at the present time involves testing, the matching of a detailed list of symptoms, the painstaking exclusion of other possible disorders, and a thorough review of the patient's medical history.

*Id.*

CFS, originally called chronic Epstein–Barr virus syndrome,[6] was not, in fact, recognized as a distinct medical disorder by the Centers for Disease Control (CDC) in Atlanta until 1988. It was not until that year that the CDC published objective diagnostic criteria differentiating it from related, but distinct illnesses. See: *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 941 (9th Cir.1995) (quoting report from Dr. Vincent Marinkovich, an immunologist at Stanford University Medical School) and *Michele v. NCR Corporation,* 1995 WL 296331 at *3 (6th Cir. May 15, 1995).

---

5. Reproduced record is a reference to the documents filed by plaintiff in support of his motion for summary judgment, record document no. 21.

6. More recent studies suggest that the relationship between the Epstein–Barr virus and chronic fatigue syndrome may be more attenuated than originally thought. Harvey L. McCormick, *Social Security Claims & Procedure,* § 464 (4th Ed.1995), citing Journal of the Am. Medical Ass'n, Chronic Fatigue: A Prospective Clinical and Virological Study, (July 4, 1990). However, "Chronic Epstein–Barr virus" and "chronic fatigue syndrome" continue to be used somewhat interchangeably. *Id.* and *Cohen v. Secretary of Health & Human Services,* 964 F.2d 524, 528–29 (6th Cir.1992).

CFS can last anywhere from six months to many years and cause a variety of symptoms. Under the guidelines established by the CDC in 1988, a patient may be diagnosed with CFS if eight of the following symptoms persist or recur for at least six months: chills or low grade fever, sore throat, joint pain (without swelling), muscle pain, extreme fatigue, neurological problems (confusion, memory loss, visual disturbances), headaches, sleep disorders, tender lymph nodes, muscle weakness, or a sudden onset of symptoms. This list is not exclusive and other symptoms may also be present. *McFarland v. Sullivan,* 1991 WL 259227 (E.D.Pa.1991).

In *McFarland,* the United States District Court for the Eastern District of Pennsylvania, citing the absence of any definitive medical criteria for diagnosing or eliminating the possibility of CFS, applied the Third Circuit standards applicable to a claim in which subjective complaints of pain are not fully confirmed by objective medical evidence to determine the validity of plaintiff's claim that she was rendered disabled by CFS. Although McFarland was applying for social security disability benefits, and, as we fully recognize, different standards apply,[7] the criteria applied in that case to assess the validity of plaintiff's claim offer some guidance here.

Under the standard applied in *McFarland,* the claimant's complaints of subjective pain could not be discounted if reasonably supported by medical evidence, unless there is medical evidence to the contrary. Applying this standard to the record before it, the court concluded that the administrative law judge had erred in rejecting McFarland's subjective complaints of fatigue, pain and other symptoms as not fully supported by objective medical evidence, noting that both of McFarland's long-time treating physicians found her to be disabled by CFS. The only evidence indicating otherwise was a psychological report stating that she exaggerated her symptoms, and a conclusion by the Social Security Administration's medical expert (who had not examined McFarland) that an Epstein–Barr antibody test indicated that the claimant did not have CFS. The court stated that, in view of recent medical developments in the study of CFS and the conclusion of experts in the field that the test for Epstein–Barr is not a reliable indicator of the presence of CFS, the medical expert's conclusion was most likely based on outdated information. The court added that the psychological report by itself was greatly outweighed by other evidence. The court remanded the case to allow the Secretary to make a new determination based on recent medical developments. See also: *Cohen v. Secretary of Health & Human Services,* 964 F.2d 524, 528–29 (6th Cir.1992).

In December, 1988, Mitchell saw Dr. Ginsburg, complaining of a cough and sore throat of a prolonged nature. The following month, January, 1989, he again saw Dr. Ginsburg, complaining again of continuing, long-term fatigue. He is seen at Geisinger by Dr. Gordon on January 30, 1989, whose findings (stated above) are reported to Dr. Ginsburg. In his history recounted to Dr. Gordon, plaintiff states that he experienced what he perceived to be the onset of this illness in August, 1988, stating that after hiking in the woods on August 20, 1988, he "felt achy" as if he were contracting an illness. (Reproduced record at p. 26) Mitchell is seen again by Dr. Ginsburg in March and again in June, 1989, again with complaints of continuing fatigue.

---

**7.** To qualify for disability insurance payments, a claimant must establish that she is disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(a)(1)(D) (1988). A claimant is entitled to receive disability insurance benefits "only if [the claimant's] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (1988).

"In determining whether a claimant is entitled to disability insurance payments, medical opinions and diagnoses of treating physicians are entitled to great weight, and if uncontradicted, are entitled to complete deference." *Cohen,* 964 F.2d at 528. The Administrative Law Judge is not, however, bound by conclusory statements of doctors, particularly if they are unsupported by detailed objective criteria and documentation. *Id.*

Matched against the CDC criteria for diagnosis of CFS, it is clear that plaintiff exhibited some of the eight symptoms identified by the CDC as indicative of CFS: 1) he reported experiencing fevers, although when seen by physicians, his temperature was generally normal; 2) he complained repeatedly of longstanding sore throat and cough; 3) he complained repeatedly of extreme fatigue—reporting, for example, feeling "very old" after mowing the lawn for one-half hour (Reproduced record at p. 19), and having difficulty walking one block to his house because of his extreme fatigue (*Id.*). These symptoms support the diagnosis of CFS made by Drs. Gordon and Wolfe.

Although many of these symptoms are based on plaintiff's subjective complaints of fatigue, fevers, etc., the court can consider plaintiff's subjective complaints if supported by or coupled with medical findings consistent with such complaints. See: *McFarland*.

**Evidence of functional impairment**

The second prong of the disability standard is the requirement that the plaintiff demonstrate his inability to perform not only his former job, but also any job for which he could be trained. On this issue, plaintiff offers the following:

1) An "Attending Physician's Statement of Functional Capacity" prepared by Dr. Wolfe (record document no. 21 at pp. 42–45), containing a chart listing various activities and providing a space for the responding physician to indicate whether there is "no limitation," "some limitation", "extreme limitation" on the patient's ability to perform the listed activities. There is also a space for the physician to indicate that he "cannot determine" whether the patient can perform the activity specified.

In filling in this chart, Dr. Wolfe indicated that Mitchell has "no limitation" in performing the following activities: sitting, reaching overhead (extended), pulling or pushing or twisting, grasping or handling, bending or stooping or squatting, performing tasks requiring fine hand dexterity, performing highly repetitive motion, or paying fine visual/auditory attention. (Record document no. 21 at p. 43);

Dr. Wolfe indicated that plaintiff has "some limitation" in performing the following activities: walking, climbing stairs or a ladder, balancing, performing tasks in a cramped, unusual position, operating a truck, dolly or small vehicle, operating heavy equipment, and engaging in precise verbal or written communication. There were no tasks listed for which Dr. Wolfe indicated that plaintiff was subject to extreme limitation or for which he could not determine plaintiff's limitations. (Record document no. 21 at p. 43).

The statement includes a second chart listing various weights, with a space for the responding physician to indicate whether the patient could never lift an object of that weight or could lift such objects only a certain percentage of the workday. Dr. Wolfe indicated that plaintiff could never lift objects weighing in excess of sixteen pounds and could lift for only 20% of the workday objects weighing less than that amount. (Record document no. 21 at p. 44).

Finally, in response to a question asking "Is the patient now totally disabled?", Dr. Wolfe replied in the affirmative. (Record document no. 21 at p. 44). It is this response which comprises essentially plaintiff's entire case on the question of job performance ability.

2) The report of Dr. Gantz. (Record document no. 21, pp. 125–33.) dated September 21, 1993, stating, *inter alia*, that plaintiff is "physically incapable of increased or sustained activities. He cannot keep a regular schedule because of his constant fatigue and his loss of concentration." (Record document no. 21, p. 126).[8]

3) A letter from Dr. Gantz dated August 18, 1994, stating that plaintiff exhibits symptoms of "severe fatigue, fevers, join paint, muscle pain, sore throats, markedly decreased concentration, headaches, muscle weakness and occasional sleep prob-

---

**8.** These documents alone we previously found insufficient to establish the second prong of the disability requirements.

lems ... [and] a secondary depression as a result of his illness." (Record document no. 23, exhibit "A")

Dr. Gantz further states that:

the frequency and severity of symptoms in patients with ... Chronic Fatigue Syndrome vary greatly and can wax and wane. There is no pattern to the cycle, and ... it is difficult to say when he will have good days or bad days. Mr. Mitchell continues to be under considerable psychological distress ... greatly exacerbated by his tenuous financial situation. *Id.*

Dr. Gantz goes on to comment on the impact that these symptoms have on plaintiff's abilities, stating that: ... [R]estricting activities is the only way to prevent

exacerbation of his CFS [Chronic Fatigue Syndrome] symptoms. He is capable of only mild, intermittent activities. His ability to sustain any activity, even for a few hours a day is unpredictable. Any prolonged activity, even sedentary worsens his condition, and can cause exacerbation of symptoms. Therefore his activities of daily living are markedly limited, as is [sic] his abilities to complete tasks. This illness has radically limited Mr. Mitchell's life. I feel that Mr. Mitchell is 100% disabled at this time and work for him is out of the question. I will continue to follow Mr. Mitchell and investigate therapies to counteract this devastating illness.

*Id.*

Dr. Gantz' conclusions are consistent with CFS' noted capability of causing extreme fatigue and severely debilitating symptoms. See, e.g., *Walders v. Garrett,* 765 F.Supp. 303, 305 n. 5 (E.D.Va.1991) (citations to medical journals omitted), *affirmed without opinion,* 956 F.2d 1163 (4th Cir.1992).

The plan administrator's only criticism of Dr. Gantz' report was his failure to state whether plaintiff was disabled, i.e. "totally and continuously unable to engage in *any* substantial gainful work for which he was qualified as of June 26, 1989." (Record document no. 23, exhibit "B"). We do not share that criticism.

Although the report, admittedly, could have been more explicit on this point, it, along with the other evidence before us, does support plaintiff's contention that he was totally disabled as of June 26, 1989. The facts before us clearly support the conclusion that plaintiff was suffering from CFS well before it was formally diagnosed and unquestionably on or before June 26, 1989.

As we chronicled above, it took some time to definitely diagnose plaintiff's condition, but he had definitely exhibited symptoms markedly characteristic of CFS before that date. The symptoms which Dr. Gantz details in his letter of August 18, 1994, e.g. severe fatigue, markedly decreased concentration, headaches, muscle weakness and occasional sleep problems, are characteristic of CFS and would undeniably have been present, to some degree or other on June 26, 1989. As Dr. Gantz states in his letter, the "frequency and severity" of these symptoms "vary greatly and can wax and wane." (Record document no. 23, exhibit "A") In his words, "[t]here is no pattern to the cycle, and ... it is difficult to say when he will have good days or bad days." It is, in fact, the absence of any definable pattern that makes the illness disabling. As Dr. Gantz goes on to point out, plaintiff "is capable of only mild, intermittent activities ... [and] his ability to sustain activity, even for a few hours a day is unpredictable."

The symptoms which Dr. Gantz described are undeniably characteristic of CFS. We are convinced from the facts before us that plaintiff had CFS on June 26, 1989 and equally convinced that he would have been experiencing the symptoms which Dr. Gantz describes as of that date. Those symptoms, i.e. the inability to complete, the unpredictable onset of extreme fatigue and marked difficulty in concentrating would have made it impossible then, just as it does now, for him to maintain gainful employment.

Therefore, despite the fact that Dr. Gantz' report is framed entirely in terms of plaintiff's present condition, it, along with the other evidence before us, supports plaintiff's assertion that he was totally disabled as of June 26, 1989.

Although Mitchell does not proffer any evidence or opinions from a vocational expert, none is required in this context. Dr. Gantz opines that plaintiff is 100% disabled and unable to perform any work. Cf. *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir.1989) (plan administrator should have obtained a qualified opinion from a vocational expert before terminating plaintiff's disability benefits). Dr. Gantz' conclusion is supported by the reality of workplace requirements and expectations. See, e.g., *Kennedy v. Applause, Inc.*, 1994 WL 740765 (C.D.Cal. Dec. 6, 1994) (chronic fatigue syndrome sufferer unable to work regular hours was not a "qualified individual" under the ADA because reliable attendance was a minimum function of any job.)

Mitchell was awarded social security disability benefits effective April 22, 1991. That fact does not alone evince entitlement to disability benefits under the Eastman Kodak plan since the qualifying standards differ. See generally: *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985) and *Freeman v. Sickness & Accident Disability Plan of AT & T Technologies, Inc.*, 823 F.Supp. 404, 415–16 (S.D.Miss.1993).

Defendant offers no expert reports or other evidence to counter plaintiff's proof, but merely argues for denial of benefits based on the alleged insufficiency of plaintiff's evidence to establish qualifying disability as of June 26, 1989.

Based on the evidence adduced by plaintiff, the absence of any evidence to the contrary adduced by defendant, and for all of the reasons discussed above, we find that the evidence adduced here supports plaintiff's contention that he suffers from chronic fatigue syndrome and that his condition rendered him unable to perform any substantially gainful employment as of the effective date. See, e.g. *Rose v. Shalala*, 34 F.3d 13 (1st Cir.1994) (First Circuit vacated and remanded a denial of social security benefits to a claimant with chronic fatigue syndrome and other ailments, finding that substantial evidence did not support an administrative law judge's (ALJ's) conclusion that the claimant had no disability. Uncontroverted medical evidence demonstrated that plaintiff had chronic fatigue syndrome and experienced fatigue symptoms that affected his functional capacity); *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F.Supp. 106, 109–116 (S.D.N.Y.1994); and *Reed v. Secretary of Health & Human Services*, 804 F.Supp. 914 (E.D.Mich.1992). Compare: *Michele*, 1995 WL 296331 at *3–4 (physician's determination of disability unsupported by few, if any, objective findings, justifying denial of long-term disability benefits); *Emmott v. Consolidated Freightways, Inc.*, 1995 WL 236674 (6th Cir. Apr. 21, 1995) (plaintiff's physicians' reports, coupled with evidence that he was taking frequent motorcycle trips around the country at or about the same time he was allegedly totally disabled, justified plan administrator's decision to terminate disability benefits) and *Dennis v. Standard Insurance Company*, 1994 WL 721840 (9th Cir. Dec. 29, 1994) (plaintiff's physicians' reports, coupled with her own description of a typical day including admissions that she engaged in such demanding activities as skiing after the alleged onset of CFS, in the court's words "provide more than substantial evidence to support" the insurer's determination that plaintiff was not disabled).

On that basis, we reject the conclusion of the plan administrator that plaintiff does not qualify for long term disability benefits and will grant plaintiff's motion for summary judgment in his favor.